EVERETT J. CREWS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 66767.   Promulgated September 18, 1935.

*Albert L. McRill, Esq.*, for the petitioner.
*W. R. Lansford, Esq.*, for the respondent.

42

OPINION.

TRAMMELL: In his petition the petitioner alleges that the respondent erred (1) in including in taxable income the amount of $59,890.62 as his share of the income of the Crews heirs and (2) in not allowing a depletion deduction with respect to his interest in the oil and gas property.

In his brief the petitioner contends that he not only did not have any income from the property, but sustained a loss with respect thereto in the amount of $25,858.06, and that he is entitled to a deduction of $80,663.30 as a depletion allowance. The respondent admits that he erred in not allowing depletion with respect to the petitioner's interest in the property, but denies that the petitioner is entitled to the amount now claimed by him.

With respect to the allowance for depletion on oil and gas properties, section 114 (b) (3) of the Revenue Act of 1928 provides as follows:

(3) PERCENTAGE DEPLETION FOR OIL AND GAS WELLS.—In the case of oil and gas wells the allowance for depletion shall be 27½ per centum of the gross income from the property during the taxable year. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance be less than it would be if computed without reference to this paragraph.

While in the instant proceeding we are called upon to determine the amount of the petitioner's share of the income from the property and the amount of his depletion allowance with respect thereto, we shall first determine the amount of the income and the depletion allowance with respect to the Crews heirs as a unit and then ascertain the amount of the petitioner's one-sixth share thereof.

There is no contention by either party and nothing in the record to indicate that the petitioner's depletion allowance is to be computed without reference to the provisions of section 114 (b) (3). We, therefore, conclude that it is applicable. It provides that the depletion allowance in the case of oil and gas wells shall be 27½ per centum of the gross income from the property during the taxable year, subject to the limitation that such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property.

The phrase " gross income from the property " " can only be construed as referring to the property with respect to which the depletion allowance is sought. Income from all other sources must be excluded in computing the depletion allowance." *Greensboro Gas Co.*, 30 B. T. A. 1362. As was said by the Supreme Court in *Helvering* v. *Twin Bell Oil Syndicate*, 293 U. S. 312:

The phrase, we think, points only to the gross income from oil and gas. Compare *United States* v. *Dakota-Montana Oil Co.*, 288 U. S. 459, 461; *Greensboro Gas Co.* v. *Commissioner*, 30 B. T. A. 1361. So restricted, it presents no difficulty where the owner of the land is also the operator, and there is none where the lessee turns over royalty oil in kind to the lessor, for the retained oil, in that case, is the basis for the lessee's computation of depletion and the royalty oil that for the lessor's. We think Congress did not intend a different result where, as here, the lessee sells all the oil and pays over the royalty in the form of cash.

In view of the foregoing, income of the Crews heirs received as interest on bonds, notes, and bank balances would not constitute part of the gross income from the property in determining the depletion allowance. To what extent the $355,000 received by the heirs from the Sinclair Oil & Gas Co. under the compromise agreement settling the litigation represented payment for oil and gas taken by that company from the land of the heirs is not clear from the record. However, since the respondent has determined it to be income from the property, and the petitioner contends that it was, and since the evidence does not show it to be otherwise, we conclude that it constitutes part of the gross income from the property in computing the depletion allowance.

The evidence shows that the proceeds from the oil and gas produced by the Crews heirs during the period of their operations on the property amounted to $1,462,504.02. Is that entire amount to be included in the gross income from the property in computing the depletion allowance? In determining the gross income the respondent included therein no amount with respect to United States bonds in the amount of $514,000 supposed to have been in the escrow account when the Crews heirs became entitled to the proceeds thereof but which were not recovered and with respect to which

the heirs had never received anything. The petitioner takes the position that the respondent erred in so doing and that the full amount of the proceeds from the sale of oil and gas, $1,462,504.02 including the $514,000, constituted gross income from the property.

The evidence shows that the heirs were faced with the notice served by the Sinclair Oil & Gas Co. upon purchasers of the production of the heirs that it and its associates claimed the income from all production made by the heirs. In order to provide an outlet for their production by affording protection to the purchasers the heirs entered into the escrow agreement of June 13, 1922, whereby seven eighths of the purchase price of the production was to be deposited in an escrow account pending the termination of the litigation either by court judgment or by a settlement out of court, and then to be paid to the Crews heirs if by court judgment they should be held to be entitled to it or if by agreement they should become entitled to it.

The escrow agreement, in paragraph 3, after providing how the purchase price of the production should be determined, provided that one eighth of such purchase price, apparently the royalty that the heirs were entitled to irrespective of how the litigation terminated, should be paid to the heirs and that the remaining seven eighths of the purchase price was " to be deposited in escrow in the Farmers State Bank of Garber, Oklahoma." So far as we can determine from the record the seven eighths of the purchase price which was to be deposited in the escrow account was not paid to the heirs and by them deposited in the escrow account. Considering the provision of the agreement in the light of the circumstances under which it was entered into and its purpose, we think it meant that the purchaser was to make deposit in the escrow account at the bank of seven eighths of the purchase price. Since we find nothing in the record to the contrary, we conclude that such was the procedure intended by the agreement and that such was the procedure followed.

The record contains no statement as to who originated the idea of the escrow agreement; whether it was proposed by the Crews heirs or by the purchaser of their production, the Garber Refining Co. Irrespective of the originator, it is clear that its purpose was to provide a protection to the purchaser that would not be afforded it if the entire purchase price of the production were paid over to the Crews heirs and thus made available to their unqualified and unrestrained use and disposition. While the purchaser did not actually retain the seven eighths of the purchase price of the production, the evidence shows that its president, G. J. Taft, was also vice president of the Farmers State Bank and its managing director, and by reason of this such portion of the purchase price remained under the control

of a man who was a responsible official of the purchaser. There is nothing in the record to indicate that the heirs as a generous gesture to the purchaser freely agreed to the depositing of the seven eighths of the purchase price in the escrow account. What evidence there is bearing on the point indicates that this or some similar arrangement was the only course open to them for proceeding with production in view of the notice given by the Sinclair Oil & Gas Co.

So far as the receipt of income by the heirs is concerned, the situation is, we think, very similar to that where a receiver is appointed. In *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417, the question for decision was whether certain money received by the company in 1917 constituted taxable income in that year. In 1916 the company operated a section of oil land, the legal title to which stood in the name of the United States. Prior to 1916, the Government, claiming also the beneficial ownership, had instituted a suit to oust the company from possession. In February 1916 it obtained the appointment of a receiver to operate the property or supervise its operations and to hold the net income therefrom. In 1917, after entry by the District Court of the final decree dismissing the Government's bill, the money was paid to the company by the receiver. The Government took an appeal to the Circuit Court of Appeals which in 1920 affirmed the decree of the District Court. In 1922 a further appeal to the United States Supreme Court was dismissed. In its original return for 1916 the company did not include the amount in its income, but in an amended return for that year filed in 1918 reported the amount as income. The Commissioner took the position that the amount constituted income for 1917. In holding that the amount was taxable income for 1917 and not 1916, the Supreme Court said:

Second. The net profits were not taxable to the company as income of 1916. For the company was not required in 1916 to report as income an amount which it might never receive. See *Burnet* v. *Logan*, 283 U. S. 404, 413, 51 S. Ct. 550, 75 L. Ed. 1143. Compare *Lucas* v. *American Code Co.*, 280 U. S. 445, 452, 50 S. Ct. 202, 74 L. Ed. 538; *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359, 363, 51 S. Ct. 150, 75 L. Ed. 383. There was no constructive receipt of the profits by the company in that year, because at no time during the year was there a right in the company to demand that the receiver pay over the money. Throughout 1916 it was uncertain who would be declared entitled to the profits. It was not until 1917, when the District Court entered a final decree vacating the receivership and dismissing the bill, that the company became entitled to receive the money. Nor is it material, for the purposes of this case, whether the company's return was filed on the cash receipts and disbursements basis, or on the accrual basis. In neither event was it taxable in 1916 on account of income which it had not yet received and which it might never receive.

Third. The net profits earned by the property in 1916 were not income of the year 1922—the year in which the litigation with the government was finally terminated. They became income of the company in 1917, when it first

became entitled to them and when it actually received them. If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. See *Board v. Commissioner of Internal Revenue* (C. C. A.), 51 F. (2d) 73, 75, 76. Compare *United States* v. *S. S. White Dental Manufacturing Co.*, 274 U. S. 398, 403, 47 S. Ct. 598, 71 L. Ed. 1120. If in 1922 the government had prevailed, and the company had been obliged to refund the profits received in 1917, it would have been entitled to a deduction from the profits of 1922, not from those of any earlier year. Compare *Lucas* v. *American Code Co., supra.*

Considering the facts in the instant case in the light of the foregoing statements of the Supreme Court, we think it is clear that until the Crews heirs became entitled to receive the proceeds of the escrow account as a result of the agreement with the Sinclair Oil & Gas Co. by which the litigation was terminated they can not be said to have been in receipt of income therefrom. Did the fact that in 1930 they became entitled under the agreement to receive $514,000 of United States bonds which were supposed to have been in the escrow account but which were not, and with respect to which they have never recovered anything, in and of itself constitute the receipt of income by them to the amount of $514,000 or any other amount? The answer must be no. By becoming entitled to receive the bonds they acquired an empty and worthless right, for the bonds were not in the account, a fact that was brought to their knowledge on the same day and immediately following the execution of the agreement settling the litigation. Under these circumstances we are unable to hold that any income was realized in so far as this item was concerned.

The petitioner takes the position that, in determining the gross and net income of the Crews heirs from the property for the purpose of ascertaining his depletion allowance, no reduction should be made in the amount of the total proceeds from the oil and gas produced by the heirs on account of their failure to receive anything with respect to the United States bonds, and urges that in computing the net income of the heirs from all sources, including the income from the oil and gas property, the amount of $514,000 should be allowed as a deduction for a loss. While in determining the deficiency the respondent included no amount in income with respect to the item, it appears that his position now is that in determining the gross income from the property no reduction is to be made in the total proceeds from the oil and gas produced by the heirs because of their failure to receive anything on account of the bonds, and that in computing the net income from the property a deduction of $514,000 should be made. We do not think that the position of either party is sound. With respect to the position of the re-

spondent, we think the record is clear that the item in controversy had no connection, either direct or indirect, with the production of income from the property. It in no wise represents an expenditure or cost incurred by the heirs either in producing such income or in obtaining payment of it. The position of the petitioner is anomalous in that he contends that the item was both income and a loss. Under the cash receipts and disbursements method of reporting income which was employed by the heirs, including the petitioner, an amount must have been received either actually or constructively before it constitutes income. Then before the same amount can be considered as a loss it subsequently must have become involved in some transaction whereby it was lost. The record clearly discloses that the amount was never received by the heirs and consequently it was not income to them. It therefore follows that, never having received the amount, they can not be said to have sustained a loss of it.

In taking the position he does the petitioner seeks to obtain the benefit that would come from the allowance of depletion with respect to that portion of the production of the heirs the proceeds from which were supposed to have been invested in United States bonds and at the same time avoid the payment of any tax with respect to the proceeds from such portion of the production. His position with respect to the depletion allowance might be more tenable if under the statute such allowance was to be computed on the value of the oil and gas reserve at the time of inheritance or such value on March 1, 1913, or if the taxable year were governed by some prior act permitting depletion based on discovery value, as under those circumstances the unit of depletion rate would be permissible. Section 114 (b) (3) of the applicable act permits the allowance of depletion computed on cost or a value as of a basic date when the allowance computed under the percentage of income method therein provided is smaller. The petitioner here contends for an allowance computed under the percentage of income method undoubtedly for the reason that the allowance would be less if computed on the value as of a basic date. Nor is an allowance computed on discovery value permissible, for, as was pointed out in *Helvering* v. *Twin Bell Oil Syndicate, supra*, Congress abandoned this method, beginning with the Revenue Act of 1926, and substituted a percentage of income method because of difficulties in administration.

If it is the contention of the taxpayer that the expression "gross income from the property" means the gross income from the oil and gas produced from the property regardless of whether the taxpayer receives it or whether it arises as income of the taxpayer, we can not agree with him. Sections 11 and 12 of the Revenue Act of 1928 impose a normal tax and a surtax upon "the net income of every

individual" who has net income of the amounts specified therein. Section 21 provides as follows:

"Net income" means the gross income computed under section 22, less the deductions allowed by section 23.

Section 22 provides:

(a) *General definition.*—"Gross income" includes gain, profits and income derived from * * * trades, businesses, commerce, or sales or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from * * * the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever.

Section 23 provides:

In computing net income there shall be allowed as deductions:

(1) *Depletion.*—In the case of mines, oil and gas wells, * * * a reasonable allowance for depletion * * * according to the peculiar conditions in each case; * * * In the case of leases the deduction shall be equitably apportioned between the lessor and lessee. * * * In the case of property held in trust the allowable deduction shall be apportioned between the income beneficiaries and the trustee in accordance with the pertinent provisions of the instrument creating the trust, or, in the absence of such provisions, on the basis of the trust income allocable to each. * * *

Section 42 provides:

The amount of all items of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under section 41, any such amounts are to be properly accounted for as of a different period.

Section 41 provides:

The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; * * *

From a consideration of the provisions of sections 11, 12, 21, 22, 41, and 42 it seems clear in the case of individuals that the gross income and net income that is to be considered in the determination of their tax liability is *their* gross income and *their* net income, both determined in accordance with the act, and that where the books are kept on a cash basis it is income which they have *received* during the taxable year. It must be income of the individual taxpayer involved and not the income of another. Further, it must be income which he has received and not income which he might have received if certain nonexistent conditions had existed or if certain events had transpired which did not transpire. The income contemplated by the sections of the act is not a mere reservoir of funds or money a portion or all of which a particular individual taxpayer might under some circumstance become the recipient of. It is income which has been *derived* by the taxpayer and which has been *received* by him.

The first sentence of section 114 (b) (3) of the applicable act, in providing for a depletion allowance of "27½ per centum of the gross income from the property during the taxable year", does not specifically state whose gross income from the property is contemplated, as is done in the second sentence with respect to the net income from the property, which reads "50 per centum of the net income *of the taxpayer* * * * from the property." (Italics supplied.) Is the omission of the phrase "of the taxpayer" in the first sentence and its inclusion in the second sentence of any particular significance? Does the omission of the phrase "of the taxpayer" in the first sentence mean that in determining the depletion allowance of 27½ per centum of gross income from the property such gross income is not limited to the taxpayer's gross income from the property or restricted to his interest in the gross income therefrom? Further, does it indicate that the gross income from the property is to consist of something which would not be gross income to the taxpayer within the meaning of that term under the other provisions of the act?

Section 23 (l) of the act authorizes a deduction for depletion and section 114 (b) (3) merely provides the basis or method for computing the amount of the allowance. *Greensboro Gas Co., supra.* Under section 23 (l), where the owner or owners of the land are also the operators, as is the case here, they are the ones entitled to the depletion allowance. The section also provides for an allocation or apportionment of the amount of the allowance in cases where others than the owners of the land also have an interest in the production or the proceeds therefrom. Considering the provisions of sections 23 (l) and 114 (b) (3) in connection with each other, we think it is clear that only one allowance of 27½ per centum is to be made, that such allowance is to be computed on the basis of gross income subject to the limitation with respect to net income *and* is to be allocated or apportioned to those having an interest in the production or proceeds therefrom on the basis of their respective interests. *Greensboro Gas Co., supra,* and *Helvering* v. *Twin Bell Oil Syndicate, supra.* We are also of the opinion that the gross income referred to in the expression "27½ per centum of the gross income from the property" has reference to the portion of the income of the particular taxpayer or taxpayers who are entitled to share therein on the basis of their respective interests. Since the allowance is for the depletion of such interests, we do not think that the income of any other than the owner or owners of the interests is to be included in the computation of the allowance. We find nothing elsewhere in section 114 (b) (3) or elsewhere in the act which supports a contrary view. The use of the words "of the taxpayer" in the sentence providing for a limitation of the allowance to 50 per centum of the net income strengthens our conclusion. If a contrary

view is taken, we at once run into difficulty in that we will have a net income of a taxpayer from the property computed on the basis of a gross income which in fact was not gross income to the taxpayer. This would be contrary to the general plan set up in the act for determining a taxpayer's gross income and his net income. The petitioner does not point to anything in the act, nor do we find anything in it, which justifies the conclusion that the " gross income from the property " referred to in section 114 (b) (3) is to be determined on a basis other than that contemplated by the act generally. If the amount of $514,000 were included as part of the " gross income from the property " we would have a situation where the petitioner's tax liability would be determined on the basis of an amount of income no portion of which has ever been received or, so far as the record indicates, ever will be received by either him or any of the other owners and operators of the property. We do not think Congress contemplated that such should be done. As we construe the provisions of section 114 (b) (3), an amount must meet the statutory requirements of income and must arise from oil or gas before it can be considered as gross income from the property within the meaning of the section. In providing for a depletion allowance computed on the basis of a percentage of income we think it was the intention of Congress that such income must actually be income of the taxpayer to whom the allowance is to be made and must be determined by the criteria provided in the act for ascertaining what constitutes income.

Since the $514,000 was not income to the Crews heirs, who were the owners of the property upon which they were operating, we are of the opinion that in computing the gross income from the property the total proceeds of $1,462,504.02 are to be reduced by the $514,000. This leaves $948,504.02. To that amount is to be added the $355,000 received from the Sinclair Oil & Gas Co., which gives $1,303,504.02 as gross income from the property.

The determination of the net income of the heirs from the property involves a consideration of the items that are to be deducted from gross income from the property in order to arrive at the net income therefrom. The parties have stipulated that the cost of drilling, equipping, and operating wells and certain miscellaneous expenses applicable to the production of oil and gas amounted to $849,544.37, and they are in agreement that this amount constitutes a proper deduction in determining the net income from the property. We, therefore, hold this amount is an allowable deduction in determining the net income of the heirs from the property.

With respect to fees of $163,000 paid to attorneys for services in connection with the litigation and the recovery of escrow funds and the amount of $10,000 paid to R. L. Williams, a trustee under

the indemnity contract, the petitioner takes the position that they had no relation to the production of oil and gas and therefore are not deductible from gross income from the property in determining the net income of the Crews heirs therefrom. In determining the deficiency the respondent determined that these amounts, totaling $173,000, were to be deducted from the gross income from the property in computing the net income of the heirs therefrom. He contends that that was proper.

While the petitioner presented no evidence directed to the detailed activities of the attorneys and to the activities of Williams, such evidence as the record contains as to their activities tends to support the respondent's determination. The $355,000 received by the heirs from the Sinclair Oil & Gas Co. was in compromise of the litigation. This amount we have held to be a part of the gross income from the property. At least two of the attorneys, Sutton and Dyer, were attorneys for the heirs in this litigation. If the amount received upon the compromise of the litigation was gross income from the property we perceive no valid reason why the fees of these attorneys, totaling $158,000, should not be deducted from the gross income from the property in determining the net income therefrom. While it may be true that the services of the attorneys never in any wise contributed to the production of oil and gas from the property, nevertheless we think their services were a factor contributing materially to the receipt by the heirs of the amount paid by the Sinclair Oil & Gas Co. The record indicates that the services rendered by Owens, an attorney, and by Williams, a trustee under the indemnity contract, and to whom a total of $15,000 was paid, were rendered in connection with recovery on the escrow account. Since the entire amount deposited in the escrow account in excess of an amount of $514,000 heretofore considered has been held to be gross income from the property, we do not know of any reason why amounts paid for services of those engaged in realizing on the account should not be deducted in determining the net income from the property. We accordingly hold that the amounts paid to the attorneys and Williams are proper deductions in determining the net income from the property.

From the gross income from the property of $1,303,504.02, as found above, there is to be deducted the amount of $849,544.37 representing expenditures for drilling, equipping, and operating wells, etc., and the amount of $173,000 representing expenditures for the services of attorneys and another, or a total of $1,022,544.37. This leaves a net income of $280,959.65 from the property without deduction for depletion. Twenty-seven and one-half percent of the gross income from the property is $358,463.61. Fifty percent of the net income from the property is $140,479.83. Twenty-seven and one-half

percent of the gross income from the property being greater than 50 percent of the net income therefrom without deduction for depletion, the statute limits the depletion allowance of the heirs to the amount of the latter, or $140,479.83. Since the petitioner owned a one-sixth interest in the property, his depletion allowance is $23,413.31.

The remaining issue presents for determination the question of what amount is to be included in the gross income of the petitioner as his share of the net income of the Crews heirs from all sources, including the operation of the oil and gas property. The net income of the heirs from the property without deduction for depletion was $280,959.65. In addition they had income of $47,871.79 as interest on bonds, bank balances, and notes. Their total net income from all sources without deduction for depletion, therefore, was $328,831.44, of which the petitioner's one-sixth interest was $54,805.24.

In a recomputation of the petitioner's tax liability the amount of $54,805.24, representing his share of the net income of the Crews heirs from all sources without deduction for depletion, will be included in his gross income and the amount of $23,413.31 representing depletion with respect to his interest in the oil and gas property will be allowed as a deduction.

At the hearing the respondent amended his answer and asked for an increase in the deficiency on the ground that he failed to include in the income of the petitioner any portion of the value of the contract of indemnity given the Crews heirs in 1930 guaranteeing them against any losses from the escrow account. The evidence shows that the contract was worthless from the date of its execution and we have so found as a fact. In view of this the request of the respondent must be denied.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

SEAWELL and MATTHEWS concur in the result.

---

TURNER, dissenting: The unusual and complicated facts in this case have, in my opinion, induced the Board to make an erroneous interpretation of section 114 (b) (3) of the Revenue Act of 1928. The application of this provision to the facts seems to me to be clearly contrary to the plain language of the statute.

In stating my views, it seems advisable to summarize the pertinent facts which are set out in detail in the findings of fact preceding the prevailing opinion. The Sinclair Oil & Gas Co. had, through various transfers, acquired an oil and gas lease to property inherited by this taxpayer and his brothers and sisters. Difficulties arose which

brought on court proceedings to set aside the lease. In 1922 this taxpayer, through his guardian, with the coheirs, undertook the operation of the property to prevent its drainage through wells on adjoining properties. By reason of the claim of the Sinclair Oil & Gas Co., it was necessary for the heirs to agree to the deposit in escrow of the proceeds from the sale of the oil so produced until final disposition of the litigation then pending. An agreement was accordingly entered into with the Garber Refining Co., purchaser of the production, for such deposit with the Farmers State Bank as escrow agent. The fund so held in escrow was finally to be distributed in accordance with the disposition of the litigation pending between the heirs and the Sinclair Oil & Gas Co. This arrangement continued until 1930, when a settlement of the litigation was concluded by compromise. Up to that time the production from the property had amounted to $1,462,504.02, all of which sum had been deposited with the escrow agent. There had been expended as cost of operation a total of $849,544.37, which amount had been released by the escrow agent for that purpose only. On settlement of the litigation it was discovered that the escrow agent had dissipated the funds. Of this amount, $514,000 had been put in bonds, but the bonds had been misappropriated. To cover the losses in the escrow fund, assets of the escrow agent, represented to have a value in excess of $900,000, were placed in the hands of the trustees under an indemnity contract. The work-out of these assets amounted to only an approximate amount of $1,000, while the expenses of the trust amounted to $39,000. The indemnity contract was worthless at the time of its execution. While the operation of the property under the escrow agreement covered the period from 1922 to 1930, it was agreed between the parties herein that full accounting for the income therefrom should be made in 1930, the year of the settlement of rights under the escrow agreement.

In the prevailing opinion the gross income of the heirs from the oil property in question is found to be $1,303,504.02. Of this amount $355,000 represents the recovery from the Sinclair Oil & Gas Co., while the remaining $948,504.02 represents the difference between $1,462,504.02, the amount of the gross sales under the escrow agreement, and $514,000, the sum invested by the escrow agent in the bonds which were later misappropriated. This sum of $514,000 is excluded from the gross income of the heirs under authority of *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417. It is then held that the gross income of the heirs from the property is the same as " the gross income from the property ", within the meaning of section 114 (b) (3), *supra*, and that $1,303,504.02 is the amount from which the depletion deduction is to be computed.

54

In my opinion the conclusion reached is wrong in two respects. In the first place, the holding that the gross income of the heirs from the property is the same as " the gross income from the property " within the meaning of section 114 (b) (3), *supra*, requires the reading into the statute of language which Congress did not see fit to place there, and, in the second place, if *North American Oil Consolidated* v. *Burnet*, *supra*, is applicable, no part of the amount deposited with the escrow agent constituted gross income to the heirs in any year and, under the interpretation placed on the statute in the prevailing opinion, the depletion deduction has been computed on the basis of gross income which did not exist.

Considering first the language of the statute, it will be noted that section 114 (b) (3) is divided into two parts. In the first sentence it is stated that the allowance for depletion in the case of oil and gas wells " shall be 27½ per centum of the *gross income from the property* during the taxable year." This sentence presents a full and complete thought which is not modified or changed in any respect by any subsequent language appearing in the statute. The language is simple and unambiguous. In that sentence Congress was expressing its judgment of the extent of the exhaustion of oil properties through operation. Nothing is said there about the owners of the property or any individual taxpayer. The individual interests in the property may be varied and numerous. We have found in our findings of fact that the gross production from the property herein involved was $1,462,504.02 and the prevailing opinion accepts this finding. Neither is there any question that the oil properties were exhausted or depleted by this production. In my opinion it would be mere quibbling to say that the amount found as gross production from the property is not the " gross income from the property " contemplated by the first sentence of section 114 (b) (3), *supra*.

In the second sentence of this provision of the statute Congress, for the first time, mentioned the individual taxpayer and there provided that the depletion allowance, computed under the first sentence, may not exceed " 50 per centum of the net income *of the taxpayer* * * * from the property.*" By this sentence Congress made no change whatever in the depletion allowance prescribed by the first sentence, nor in the method of computing such allowance, but did prescribe a limitation on that allowance in respect of each individual taxpayer, the limitation so prescribed being computed on an entirely different basis and without reference to the computation made under the first sentence.

The prevailing opinion justifies its conclusion with reference to the first sentence of section 114 (b) (3), *supra*, by saying that since Congress, in the second sentence, dealt with " the net income *of the*

*taxpayer* \* \* \* from the property ", it obviously intended that the words " of the taxpayer " should be read into the first sentence. The answer to this contention is that Congress did not place any such phrase in the first sentence. By this omission Congress, itself, drew the distinction between the two sentences. According to the views previously expressed, the first sentence is complete in itself and we are not at liberty to read into the statute something that is not there, merely because we are confronted with an unusual case in which the " gross income from the property " is not the same as the gross income of the taxpayer or taxpayers from the property.

If the net income of the heirs from the property has been correctly determined and the 27½ per centum depletion allowance is computed in accordance with the views which I have expressed above, the result would not be at variance with the result in the prevailing opinion, since, under such circumstances, the depletion deduction would be finally determined by application of the limitation contained in the second sentence of section 114 (b) (3), *supra*. But even if the result should be the same in this case, an erroneous interpretation of the statute, such as we have here, should be avoided, for it is altogether unlikely that a similar application of the statute to other cases would produce correct results.

It has previously been suggested, however, that another error is apparent in the prevailing opinion which, if corrected, will not only change the depletion deduction but also the net income of the taxpayer computed without regard to the depletion allowance. The decision of the Supreme Court in *North American Oil Consolidated* v. *Burnet, supra*, has been cited as controlling in this case. There the Government and North American Oil Consolidated were both claiming title to certain property. During 1916 and 1917 it was operated by a receiver appointed at the instance of the Government. In 1917 the Government's bill was dismissed and the proceeds accumulated by the receiver from the operation of the property were paid to North American Oil Consolidated. The suit was not finally disposed of, however, until the dismissal, in 1922, by the United States Supreme Court of the Government's appeal. Later, in the case above cited, the Supreme Court held that North American Oil Consolidated realized income in 1917, the year in which it actually received the proceeds from the operation of the property. It was stated that " If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return even though it may still be claimed that he is not entitled to retain the money and even though he may still be adjudged liable to restore its equivalent." Reasoning from the language of the Court in that case, the prevailing opinion has

excluded from the gross income of the heirs the sum of $514,000 which represented that part of the escrow fund which had been invested in bonds and misappropriated by the escrow agent. It does not apply this rule, however, to the remainder of the escrow fund, but includes the remainder in the gross income of the heirs. In my opinion there is no justification under the rule laid down in *North American Oil Consolidated* v. *Burnet, supra,* for excluding the $514,000 representing the misappropriated bonds and including the remainder. The facts which are accepted by the prevailing opinion show that no part of the escrow fund was, at any time, received by the heirs in the manner and under the conditions set forth in the language quoted above from the Supreme Court's decision. According to the facts, $514,000 had been placed in bonds and the bonds misappropriated. This leaves $948,504.02 of the escrow fund, all of which has been included in the gross income of the heirs. Of this remainder, $849,544.37 was expended in the production of the oil which gave rise to the escrow fund. While it is true that this sum was expended by the heirs, or some of them, it should be remembered that it was expended in strict accordance with the terms of the escrow agreement and the heirs never, at any time, received any portion of that amount as their own " without restriction as to its disposition." If any part of the escrow fund is to be excluded from gross income of the heirs under the decision of the Supreme Court above cited, there is no basis for any claim that the amount expended under the escrow agreement as operating expenses, or any part of that amount at any time constituted gross income to this taxpayer, or any of the heirs. But even though it be said that the receipt of the $849,544.37 as expenses of operation was comparable to the receipt by North American Oil Consolidated in 1917 of the amount accumulated by the receiver, and from that it is held that the $849,544.37 was income to the heirs, there is still no basis whatever for the inclusion in the income of the heirs of the remaining $98,959.65 of the escrow fund. No part of this amount has ever been received by the heirs or any of them, from the escrow agent or any other person, and the facts show nothing from which it can be paid. or could have been paid at any time after the litigation was settled. It is to be remembered that all of the escrow fund, except $849,-544.37 which represented the expenses of operation under the escrow agreement, was dissipated by the escrow agent, and the heirs, in their own right, received nothing therefrom. The facts show that when the defalcations were discovered the escrow agent transferred to the trustees certain assets having a claimed value of $900,000 in satisfaction of its liability under the escrow agreement, and we have specifically found as a fact that this contract, whereby the said

assets were transferred in trust, was worthless from the date it was-executed.

Under such circumstances it is impossible, in my opinion, to reconcile the conclusion reached in the prevailing opinion, whereby a part of the escrow fund is declared to be income to the heirs while another portion is excluded, with the conclusion stated in *North American Oil Consolidated* v. *Burnet, supra.*

SMITH, STERNHAGEN, and MORRIS agree with this dissent.