### CREWS v. COMMISSIONER OF INTERNAL REVENUE and five other cases.
### Nos. 1459–1464.

Circuit Court of Appeals, Tenth Circuit.
March 29, 1937.

Albert L. McRill, of Oklahoma City, Okl., for petitioners.

Robert N. Anderson, of Washington, D. C. (Robert H. Jackson and Sewall Key, both of Washington, D. C., on the brief), for respondent.

Before LEWIS, PHILLIPS, and BRATTON, Circuit Judges.

PHILLIPS, Circuit Judge.

These are petitions to review decisions of the Board of Tax Appeals involving income taxes for the year 1930. The several petitions present identical questions.

The undisputed facts are these:

The six petitioners are children and heirs at law of Thomas Crews and his wife, Lulu Crews, who died in 1909 and 1910, respectively. Petitioners were minors at the time of the death of their parents and each acquired by inheritance an undivided one-sixth interest in 240 acres of land situated in Garfield County, Oklahoma, in what is now known as the Garber Oil Field. Laura Crews, their aunt, was appointed guardian for such heirs in 1912, the guardianship to continue as to each heir during minority.

On February 21, 1916, the guardian executed an oil and gas lease covering the land to B. A. Garber, reserving a one-eighth royalty. By successive assignments such lease passed in turn to Chanute Refining Company, Garfield Oil Company, Exchange Oil Company, and finally on January 9, 1922 to the Sinclair Oil & Gas Company.

On September 10, 1921, a suit was commenced in the District Court of Garfield County by the guardian and the two heirs who had reached their majority against the Exchange Oil Company, the then owner of the lease, for cancellation thereof on the ground that the Exchange Oil Company, which was also operating on all the contiguous acreage, had violated the implied covenant to drill offset wells with the result that the petitioners were being injured through drainage. On July 26, 1923, the Court found that the law of Oklahoma relative to the execution of leases by guardians with respect to property of their wards had not been complied with and adjudged the lease void in its entirety. The Sinclair Company, which had acquired an assignment of the lease, appealed the case to the Supreme Court of Oklahoma with the result that it was remanded with instructions that the lease be adjudged void as to three of the heirs who were still minors, and valid as to the three heirs who had reached their majority and had accepted royalties under the lease. Exchange Oil Co. v. Crews, 134 Okl. 229, 273 P. 228. On February 14, 1929, and subsequent to the receipt of the mandate from the Supreme Court in the above cause, the District Court rendered a second judgment, holding that the Sinclair Company should pay to the guardian of the minors the sum of $559,094.34 plus costs and interest from July 26, 1924. On October 18, 1930, while an appeal from this judgment was pending, the compromise settlement hereinafter referred to was effected.

Pending the outcome of the litigation above referred to, the petitioners entered upon the undeveloped portion of the lease and began operations under the name, Crews Estate Oil and Gas Producers. The Sinclair Company operating the developed portion served notice on the purchasers of the oil and gas produced by the petitioners that it claimed the income from such production. In order to provide an outlet for their production, the petitioners entered into an escrow agreement with the Garber Refining Company whereby it was agreed that the Refining Company would pay to petitioners one-eighth of the purchase price of the oil delivered to it and deposit the remaining seven-eighths of the purchase price in escrow in the Farmers State Bank of Garber, Oklahoma, as escrow agent; that the Bank should pay over to the petitioners from the seven-eighths part such sums as were necessary for them to use in further developing the land; that the petitioners should give the Bank a bond to indemnify it against any and all claims of the Sinclair Company to such seven-eighths part of the purchase price; that the Bank should invest the unused portion of the seven-eighths part of the purchase price in bonds and obligations of the United States; that the Bank should pay over to the petitioners the seven-eighths of the purchase price of the oil upon the rendition of a final judgment that the lease was invalid or that the petitioners were the owners of the oil delivered to the Refining Company, or upon the agreement of the parties that same should be paid to petitioners.

The Bank accepted and agreed to the escrow agreement.

On October 18, 1930, a final settlement of all litigation was effected by a compromise agreement under the terms of which petitioners were to and did receive $355,000.00 from Sinclair Company and became entitled to receive the escrow funds which had been deposited in the bank. While the record is not clear, we think it reasonable to assume that Sinclair Company retained the leasehold. Immediately after the compromise agreement was executed, the petitioners made a demand upon the Bank for delivery to them of the bonds, monies and other property in the escrow account. The officers of the Bank then, for the first time, notified petitioners that the funds in the escrow account had been dissipated and the bonds misappropriated. It also developed that the Bank was insolvent. Immediately thereafter, B. A. Garber, president of the Bank, and certain of his associates entered into an indemnity contract whereby property represented to be worth $900,000.00 was transferred to certain trustees to indemnify and secure the escrow account. The trustees expended $39,000.00 in administering the trust and were only able to collect $1,000.00. It is admitted that such contract was valueless from its execution. In consideration for the indemnity contract petitioners released the Bank from all liability for the conversion of the escrow deposit.

During the time the escrow agreement was in effect, the production from the property amounted to $1,462,504.02. Out of such amount, the Bank had advanced $849,544.37 to the petitioners which had been expended in operating the property and had invested $514,000.00 in government bonds. Petitioners had received interest on these bonds in the amount of $47,871.79. At the time of the compromise settlement, the escrow account showed a balance of $708,449.63.

In addition to the expenditure of $849,544.37 made by petitioners in operating the property, they paid $158,000.00 to attorneys for services rendered in the litigation, $10,000.00 to a trustee, and $5,000.00 to an attorney under the indemnity contract.

No accounting of the proceeds of the operations was made by the petitioners in any income tax return prior to 1930. In fact, representatives of the Commissioner of Internal Revenue investigated the question of income tax liability while the litigation was pending and agreed that a full accounting should be made upon the termination of the escrow agreement.

Each petitioner filed a return for 1930 made on the cash receipts and disbursements basis. The Commissioner redetermined the tax liability of each petitioner and proposed additional · assessments against each one. Petitions for redetermination of such tax liability were filed with the Board of Tax Appeals and it made findings and promulgated an opinion in the case of Everett J. Crews on September 18, 1935. See 33 B.T.A. 36. On November 12, 1935, the Board promulgated its opinions in the five other cases and adopted the findings in the Everett J. Crews Case, supra, 33 B.T.A. 441.

The Board held that the petitioners did not have the right to receive the proceeds in escrow prior to October, 1930 and that since the $514,000.00 in bonds were misappropriated prior to such date, petitioners neither received such amount as income nor sustained a loss of such amount. It eliminated such bonds in computing depletion, basing its action on North American Oil Consolidated v. Burnet, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197.

The computation of the Board is as follows:

| | | |
|---|---:|---:|
| Total proceeds from oil and gas | $1,462,504.02 | |
| Less stolen bonds | 514,000.00 | |
| | 948,504.02 | |
| Add Sinclair Co. compromise | 355,000.00 | |
| | | 1,303,504.02 |
| *Deductions* | | |
| Production expense | $ 849,544.37 | |
| Attorneys fees | 173,000.00 | |
| | | 1,022,544.37 |
| Net income from property before depletion | | 280,959.65 |
| Depletion allowance of 27½% of gross is $358,463.61 which is more than 50% of net income. | | |
| 50% allowance is $140,479.83 | | |
| Other income | | 47,871.79 |
| | | 328,831.44 |
| Six heirs. Each heir's net income before depletion is | | 54,805.24 |
| Each heir's depletion allowance is ⅙ of $140,479.83 or | | 23,413.31 |

In North American Oil Consolidated v. Burnet, supra, 286 U.S. 417, at page 423, 52 S.Ct. 613, 615, 76 L.Ed. 1197, the court said:

"There was no constructive receipt of the profits by the company in that year, because at no time during the year was there a right in the company to demand that the receiver pay over the money. Throughout 1916 it was uncertain who would be declared entitled to the profits. It was not until 1917, when the District Court entered a final decree vacating the receivership and dismissing the bill, that the company became entitled to receive the money."

█ The petitioners were not entitled to receive the seven-eighths portion of the purchase price of the oil until the compromise agreement was entered into with the Sinclair Company in 1930.

Prior to the making of this agreement, $708,449.63 was dissipated by the Bank or its officers. That portion of the purchase price was in fact never received actually or constructively by petitioners and never was gross income derived by them from the land.

█ $849,544.37 was conditionally advanced to them for development and operating expenses under an indemnity bond which required petitioners to indemnify the Bank against the claim of Sinclair Company thereto. The condition was removed by the compromise agreement made in 1930 so that amount became income to petitioners in 1930.

Was the $708,449.63 gross income from the property for the purpose of computing the depletion allowance?

█ Section 114(b) (3) of the Revenue Act of 1928 (45 Stat. 791, 821 [26 U.S.C. A. § 114 note]) in part reads:

"In the case of oil and gas wells the allowance for depletion shall be 27½ per centum of the gross income from the property during the taxable year. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance be less than it would be if computed without reference to this paragraph."

The above section does not grant a depletion allowance. It merely prescribes a new method or formula for computing depletion, found first in the Revenue Act of 1926 (section 204(c) (2), 44 Stat. 14). The grant of or authority for deducting depletion remains where it has always been since the Revenue Act of 1918, namely, in section 214(a) (9) of part 2, individuals (40 Stat. 1066) and section 234(a) (8) of part 3, Corporations (40 Stat. 1077). These sections provide that the allowance shall be apportioned between lessor and lessee. Helvering v. Twin Bell Oil Syndicate, 293 U.S. 312, 318, 55 S.Ct. 174, 79 L.Ed. 383.

It is true that the first sentence of section 114(b) (3) uses the phrase "gross income from the property" but we think the phrase "to the taxpayer" is necessarily implied.

█ Section 22(a) of the Revenue Act of 1928 (45 Stat. 791, 797 [26 U.S.C.A. § 22 and note]) defines gross income as follows:

"*General definition.* 'Gross income' includes gains, profits, and *income* derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and *income* derived from any source whatever." (Italics ours.)

Section 42 of the Revenue Act of 1928 (45 Stat. 791, 805 [26 U.S.C.A. § 42 and note]) in part reads:

"The amount of all items of gross income shall be included in the gross income for the taxable year in which received by the taxpayer."

Income from property is a gain, a profit, something of exchangeable value derived from the property, that is received or drawn by the recipient (the taxpayer) for his separate use, benefit and disposal. Eisner v. Macomber, 252 U.S. 189, 207, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570; Merchants' L. & T. Co. v. Smietanka, 255 U.S. 509, 520, 41 S.Ct. 386, 65 L.Ed. 751, 15 A.L.R. 1305; Commissioner v. Independent Life Ins. Co. (C.C.A.6) 67 F.(2d) 470, 472, reversed on other grounds, Helvering v. Independent Life Ins. Co., 292 U. S. 371, 54 S.Ct. 758, 78 L.Ed. 1311; Fordyce v. Helvering (C.C.A.8) 78 F.(2d) 525, 528; Central R. Co. v. Commissioner (C.C.A.3) 79 F.(2d) 697, 699, 101 A.L.R. 1448.

The word "derive" means "to receive, as from a source or origin." Webster's New International Dictionary (2d Ed.).

Hence gain or profit from property, though it comes into existence, does not become gross income until it is derived, that is received by the taxpayer.

This is a common sense construction of the section. To allow a deduction on the basis of income never received and therefore no part of the gross income, on the net part of which a tax is exacted would be manifestly unfair. While oil extracted and sold to the Refining Company depleted the land, the depletion allowance is not granted to create a depletion reserve but to allow a deduction from gross income for tax purposes and there should not be included in such gross income proceeds of oil never received by the taxpayer and no part of which became subject to income taxation.

The allowance is based on gross income from production, Darby-Lynde Co. v. Alexander (C.C.A.10) 51 F.(2d) 56, but the deduction which may be taken is dependent upon the taxpayer's share of the gross income from the property. See Helvering v. Twin Bell Oil Syndicate, 293 U. S. 312, 55 S.Ct. 174, 178, 79 L.Ed. 383; Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489.

In Helvering v. Twin Bell Oil Syndicate, supra, the Court said:

"At all events, as the section must be read in the light of the requirement of apportionment of a single depletion allowance, we are unable to say that the Commissioner erred in holding that for the purpose of computation 'gross income from the property' meant gross income from production less the amounts which the taxpayer was obliged to pay as royalties. The apportionment gives respondent 27½ per cent. of the gross income from production which it had the right to retain and the assignor and lessor respectively 27½ per cent. of the royalties they receive. Such an apportionment has regard to the economic interest of each of the parties entitled to participate in the depletion allowance."

Here the petitioners received in 1930 a one-eighth royalty on the production during that year, $355,000.00 in cash in the nature of a bonus or advanced royalty (See Murphy Oil Co. v. Burnet, 287 U.S. 299, 53 S.Ct. 161, 77 L.Ed. 318), $849,544.-

37 discharged of the obligation to indemnify the Bank, and an agreement to receive the funds in escrow which agreement was worthless. The amount of the one-eighth royalty plus the sums of $849,544.37 and $355,000.00 constituted their gross income from the property in 1930.

The depletion allowance should be 27½ per cent. of $1,204,544.37 plus the amount of the one-eighth royalty received in 1930 or 50 per cent. of the net income of the petitioners from the property, whichever amount is the lesser.

Reversed and remanded to the Board for further proceedings in accordance with this opinion.