## BREA CANNON OIL CO. v. COMMISSIONER OF INTERNAL REVENUE.

No. 7554.

Circuit Court of Appeals, Ninth Circuit.

April 22, 1935.

**68**

Claude I. Parker, John B. Milliken, and George H. Koster, all of Los Angeles, Cal. (L. A. Luce, of Washington, D. C., of counsel), for petitioner.

Frank J. Wideman, Asst. Atty. Gen., and Sewall Key, John G. Remey, and Andrew D. Sharpe, Sp. Assts. to Atty. Gen., for respondent.

Before WILBUR and GARRECHT, Circuit Judges, and CAVANAH, District Judge:

WILBUR, Circuit Judge.

The petitioner seeks to review an order of the Board of Tax Appeals relating to its income tax for the calendar years 1926 to 1930, inclusive, involving the total tax of $36,625.49. The question involved relates to the depletion allowance upon gross proceeds from oil and gas wells under the Revenue Act 1926, § 204 (c) (2), 26 USCA § 935 (c) (2); (Revenue Act 1928, § 114 (b) (3), 26 USCA § 2114 (b) (3), which provides that "in case of oil and gas wells the allowance for depletion shall be 27½

per centum of the gross income from the property during the taxable year."

Petitioner's wells produce what is known as casinghead gasoline, that is, a very volatile gasoline which comes from the well in the form of gas mixed with the more stable gas known as natural, or dry, gas. The mixture is called wet gas. After separation the merchantable products consist of casinghead gasoline and dry gas. The respondent contends, and petitioner admits, that the process of extraction of the casinghead gasoline from the wet gas is a manufacturing process. The respondent, in estimating the basis upon which the percentage of 27½ per cent. should be allowed for depletion took 40 per cent. of the gross receipts from the casinghead gasoline as the market value of the casinghead gasoline content of the wet gas as it emerged from the well, and held that the remaining 60 per cent. of the gross receipts from casinghead gasoline was attributable to the manufacturing process and, consequently, did not constitute "income from the property" within the meaning of the Revenue Act 1926, § 204 (c) (2); (Revenue Act 1928, § 114 (b) (3).

It is conceded by the petitioner that if the gross proceeds derived from the sale of casinghead gasoline should be apportioned at all, the apportionment of 40 per cent. of the gross proceeds from casinghead gasoline as the value of the gasoline content of the wet gas is correct. The sole question for our consideration then is whether or not the amount actually received from the sale of casinghead gasoline by the petitioner is subject to the allowance of 27½ per cent. for depletion, or whether the depletion should be estimated upon the market value of the gasoline content of the wet gas. The regulations of the Commissioner adopted under this act are quoted in full in the footnote.*

---

* Commissioner's Regulations:

"Regulations 69—Relating to the Revenue Act of 1926:

"Article 201.—When used in these articles (201-237) covering depletion and depreciation— * * *

"(c) A 'mineral property' is the mineral deposit, the development and plant necessary for its extraction, and so much of the surface only as is reasonably expected to be underlaid with the mineral. The value of a mineral property is the combined value of its component parts.

"(d) A 'mineral deposit' refers to minerals only, such as the ores only in the case

of a mine, to the oil only in the case of an oil well, and to the gas only in the case of a gas well, and to the oil and gas in the case of a well producing both oil and gas. The value of a mineral deposit is the value of the mineral property, less the value of the plant and equipment, and less the value of the surface of the land for purposes other than mineral production. The cost of a mineral deposit is that proportion of the total cost of the mineral property which the value of the deposit bears to the value of the property at the time of its purchase."

"Article 207.—Determination of Fair

 While the act of Congress and regulations adopted in pursuance thereof must be construed according to their plain import, it should be borne in mind in determining the amount of the depletion allowance that such allowance is intended to represent the amount of capital recovered in the product produced by the well, that is the value of the raw product. As stated by the Supreme Court, speaking through Justice Brandeis, in United States v. Ludey, 274 U. S. 295, 302, 47 S. Ct. 608, 610, 71 L. Ed. 1054: "The depletion charge permitted as a deduction from the gross income in determining the taxable income of mines for any year represents the reduction in the mineral contents of the reserves from which the product is taken. The reserves are recognized as wasting assets. The depletion effected by operation is likened to the using up of raw material in making the product of a manufacturing establishment. As the cost of the raw material must be deducted from the gross income before the net income can be determined, so the estimated cost of the part of the reserve used up is allowed." Consequently, the Commissioner has provided in his regulations that "if the oil and gas are not sold on the property but are manufactured or converted into a refined product or are transported from the property prior to sale, then the gross income shall be assumed to be equivalent to the market or field price of the oil and gas before conversion or transportation."

The petitioner concedes the validity of these regulations, but contends that the plant for the extraction of the casinghead gasoline from the wet gas is a part of the property from which the gasoline is produced, and therefore the extraction plant being erected upon the property and used in connection with the production of the casinghead gasoline that it is the gross income derived from the sale of the gasoline rather than the market value of the wet content of the natural gas which should be used as a basis for the depletion allowance. Petitioner cites Regulations 69, Art. 201, as follows:

"Article 201. When used in these articles (201–237) covering depletion and depreciation—* * *

"(c) A 'mineral property' is the mineral deposit, the development and plant necessary for its extraction, and so much of the surface only as is reasonably expected to be underlaid with the mineral. The value of a mineral property is the combined value of its component parts."

The petitioner also points to the fact that the Commissioner has treated the process of dehydrating oil as a part of the method of production of the oil and has allowed the 27½ per cent. depletion upon the in-

---

Market Value of Oil and Gas Properties— * * *

"(b) To determine the fair market value of an oil and/or gas property by the present value method, the essential factors must be determined for each deposit included in the property. The factors are (1) the total quantity of oil and/or gas in terms of the principal or customary unit (or units) paid for in the product marketed, (2) the quantity of oil and/or gas expected to be recovered during each operating period, (3) the average quality or grade of the oil and/or gas reserves, (4) the expected percentage of recovery in each process or operation necessary for the preparation of the oil and gas for market, (5) the probable operating life of the deposit in years, (6) the unit development cost, that is, cost of development exclusive of depreciation and depletion, (7) the unit operating cost, that is, cost of production exclusive of depreciation and depletion, and, (8) the rate of interest commensurate with the risk for the particular deposit. When the deposit has been sufficiently developed these factors may be determined from past operating experience. In the application of factors derived from past experience full allowance should be made for probable future variations in the rate of exhaustion, quality or grade of the oil and/or gas, percentage of recovery, cost of development, production, interest rate, and selling price of the product marketed during the expected operating life of the oil and/or gas deposit. * * *

"(e) The number of units of oil and/or gas recoverable in marketable form multiplied by the difference between the selling price and the operating cost per unit gives the total expected operating profit. The value of each oil or gas deposit is then the total expected operating profit from that deposit reduced to a present value as of the basic date at the rate of interest commensurate with the risk for the operating life, and further reduced by the value at the basic date of the depreciable assets and of the capital additions, if any, necessary to realize the profits. The degree of risk is generally lowest in cases where the factors of valuation are fully supported by the operating record of the oil and/or gas property prior to the basic date; relatively higher risks attach to appraisals upon any other basis."

70

come from the oil sold after dehydration and contends that the process of separating the casinghead gas from the wet gas is essentially the same. There is an obvious difference. In the latter case the wet gas is composed of two marketable products and is salable as such and has a market value, whereas the water content of the oil produced by a well is an impurity like the oil sand which is also sometimes mixed with the oil. Both may be separated by the operation of gravity—a settling process—although more complicated processes have been utilized. However that may be, it is immaterial for the purpose of this case whether or not the Commissioner is correct in ignoring the dehydrating process in estimating the depletable base where the oil produced contained a large water content, if he is correct in limiting the petitioners herein to the market value of the casinghead gasoline content of wet gas produced from the petitioner's property. In the latter case, it is conceded that the process is a manufacturing process and under the regulations of the Commissioner it is the market value of the net product that constitutes the depletable base. Also it is immaterial that the manufacturing process is relatively simple although it appears from the record that a large capital investment is necessary for the separation of the gasoline content of the wet gas.

The rule of the Commissioner is conceded to be lawful. The action of the Commissioner follows the rule and is presumptively correct.

Order affirmed.