EXXON CORPORATION AND AFFILIATED COMPANIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 18618–89, 18432–90.     Filed June 6, 1994.

---

*Robert L. Moore II,* for petitioners.

*Val J. Albright, Stephen C. Coen,* and *James E. Archie,* for respondent.

WHITAKER, *Judge*: This issue is before the Court on the parties' timely motion and cross-motion for partial summary judgment pursuant to Rule 121.[1] In support of respondent's motion for partial summary judgment respondent contends that petitioners are not entitled to a percentage depletion deduction based upon a hypothetical "gross income from the property" that exceeds petitioners' actual gross income from the sales of the gas at issue.[2] Petitioners in support of petitioners' cross-motion for partial summary judgment contend that, under the literal terms of section 1.613–3(a), Income Tax Regs., they must compute their percentage depletion deduction by using the "representative market or field prices" (RMFP's) of the gas at issue.[3]

## FINDINGS OF FACT

During the taxable year 1979, Exxon Co., U.S.A. (Exxon USA), a division of petitioner Exxon Corp. (Exxon), produced natural gas in Texas and transported the gas through the Exxon Industrial Gas System (EGSI).[4] On their return for the taxable year 1979, petitioners claimed a depletion deduction

---

[1] Unless otherwise noted, all section references are to the Internal Revenue Code of 1954 as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Respondent's motion was filed in both docket Nos. 18618–89 and 18432–90. However, the substance of the motion pertains only to docket No. 18618–89 and the tax year 1979. The same is true with regard to petitioners' cross-motion. Respondent indicated in the memorandum of law in support of respondent's motion for partial summary judgment that "the legal principle at issue with respect to the motion is directly applicable to a number of other percentage depletion issues in that case and the case at Docket No. 18432–90." Because we have no knowledge about the facts pertaining to years other than 1979, we express no opinion as to the applicability of the principles discussed in this opinion to other years. We do note, however, that respondent expressly stated that the motions at issue only relate "to depletion claimed for alleged fixed contracts", which also may limit the scope of the applicability of this opinion to other years.

[3] See *supra* note 2.

[4] Respondent's brief states that the gas at issue was transported through a pipeline system owned by Exxon Gas Systems, Inc. (EGSI). We use the EGSI initials in this opinion to refer to the system, which is consistent with the parties' usage.

relative to natural gas transported by EGSI. In calculating this percentage depletion, petitioners used a figure for the "gross income from the property", a percentage of which constitutes the depletion allowance, in the amount of more than $495 million. This amount was based upon purportedly appropriate RMFP's for the subject natural gas, after transportation, manufacture, or conversion. Petitioners applied a 22-percent depletion rate to petitioners' "gross income from the property", for a deduction in the amount of $109,017,036. Because of their fixed price contracts, petitioners' actual 1979 contract sales revenue of gas produced by Exxon USA and transported by EGSI for delivery under fixed contracts to certain industrial customers was considerably less than they could have sold it for in the absence of such contracts. That actual revenue was approximately $95,502,000, or about one-fifth of the "gross income from the property" for depletion purposes claimed by petitioners on their 1979 return for this gas. The difference between petitioners' claimed "gross income from the property" for purposes of depletion and petitioners' actual gross receipts from the sales of the natural gas at issue was not included in Exxon's 1979 gross income or taxable income for purposes of section 61 or 63.

Respondent conceded solely for purposes of respondent's motion several facts which involve other issues related to percentage depletion that respondent apparently believes might have required us to deny respondent's motion because of the existence of an issue of material fact. Solely for purposes of respondent's motion,[5] we find as follows:

(1) Exxon possessed the requisite economic interest in the wells for which percentage depletion is claimed;

(2) the gas at issue was sold under fixed price contracts within the meaning of section 613A(b)(1)(B) and (3)(A);

(3) the volumes of gas claimed by petitioners to be qualified for percentage depletion are so qualified;

---

[5] We view the parties' motions here essentially as two sides of the same coin. However, concessions that one party makes in support of his motion do not carry over and support the cross-motion of his adversary. 6 Moore, Moore's Federal Practice, par. 56.13, at 56–176 (2d ed. 1993). Accordingly, respondent's concessions apply only to respondent's motion. In opposition to petitioners' cross-motion respondent has submitted affidavits attempting to show that there are numerous issues of material fact in this case which pertain to the same issues as those contained in respondent's concessions made in connection with respondent's motion. Some of these issues would become moot if we ruled in favor of respondent's motion. These issues would have to be resolved if we ruled in favor of petitioners' cross-motion.

(4) petitioners properly computed the royalty exclusion;

(5) the gas at issue was not "sold on the premises but [was] manufactured or converted into a refined product prior to sale, or [was] transported from the premises prior to sale" within the meaning of section 1.613–3(a), Income Tax Regs.;

(6) there are one or more RMFP's for the gas at issue;

(7) the RMFP's determined by petitioners are "market or field prices" as defined by section 1.613–3(a), Income Tax Regs., and are "representative" within the meaning of that regulation for the gas at issue, but for the fact that they exceed the amounts for which the gas was actually sold;

(8) an RMFP may exceed the maximum lawful selling price of the gas, and/or the maximum lawful selling prices for the gas at issue were equal to or exceeded the alleged RMFP's used by petitioners;

(9) cost depletion with respect to the gas at issue does not exceed percentage depletion;

(10) the taxable income limitation provided by section 613(a) does not otherwise limit petitioners' percentage depletion deduction;

(11) the actual sales proceeds for the gas at issue do not require further reduction for any income attributable to post-production activities; and

(12) section 1.613–3(c)(6), Income Tax Regs., does not otherwise limit petitioners' percentage depletion deduction.

In respondent's determination of "gross income from the property", respondent used a type of net-back methodology, whereby the actual revenues received by petitioners for the gas after transportation were reduced by royalties in connection with the wells at issue, which resulted in a complete disallowance.[6] Petitioners ask us to hold that Exxon must use the applicable RMFP's as the figure for "gross income from the property" for purposes of percentage depletion where the gas is transported away from the well. Respondent asks the Court to hold that petitioners' "gross income from the property" for purposes of percentage depletion cannot exceed the actual gross income from the sale of the gas minus the royalty exclusion required by section 613(a); thus respondent effectively contends that under these circumstances respond-

---

[6] While typically a net-back methodology also would have required the reduction of the gross income by transportation expenses, in this case the royalty exclusion resulted in a complete disallowance, and further reduction was unnecessary.

ent may employ a net-back methodology to determine "gross income from the property".

## OPINION

Rule 121(b) provides that this Court may grant a summary adjudication in favor of the moving party where it has been shown that "there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." Respondent has conceded, solely for purposes of respondent's motion, the propriety of petitioners' depletion deduction other than with respect to the legal issue at hand. We have held that it is appropriate to do so. E.g., *Jacklin v. Commissioner*, 79 T.C. 340, 345 (1982). While there are several factual disputes concerning other aspects of petitioners' depletion deduction, the parties appear to agree that there is no issue as to any material fact with respect to the specific legal question before us. Consequently, it is ripe for summary judgment. 6 Moore, Moore's Federal Practice, par. 56.13, at 56–177 (2d ed. 1993).

Section 611 allows a "reasonable allowance for depletion" in the case of, inter alia, oil and gas wells, "according to the peculiar conditions in each case". Section 613(a) provides for a percentage depletion deduction based upon a percentage of a taxpayer's "gross income from the property".[7] While the statute is silent as to the definition of "gross income from the property" as it relates to the issue before us, respondent's regulations provide that it means

the amount for which the taxpayer sells the oil or gas in the immediate vicinity of the well. If the oil or gas is not sold on the premises but is manufactured or converted into a refined product prior to sale, or is transported from the premises prior to sale, the gross income from the property shall be assumed to be equivalent to the representative market or field price of the oil or gas before conversion or transportation. [Sec. 1.613–3(a), Income Tax Regs.]

Petitioners assert that, under the literal terms of this regulation, where, as here, the gas was transported from the premises prior to sale, respondent may not use a net-back methodology to determine gross income from the property,

---

[7] As discussed *infra*, percentage depletion was repealed for tax years after 1974, but certain taxpayers who sold gas under "fixed contracts" continued to qualify for this more favorable method.

but must apply the literal language of section 1.613–3(a), Income Tax Regs., and use the RMFP's, the result of which is considerably higher than the amount actually received by petitioners after the gas was transported away from the well. The parties have not cited, and the Court has not found, any published opinion of this Court directly involving this issue.[8]

Petitioners contend that we must follow the literal language of the regulation at issue and require use of the RMFP's without further analysis. Petitioners essentially rely upon the so-called ordinary meaning or plain meaning rule, whereby courts have held that, in the exercise of judicial restraint, the plain words of a regulation should be followed where those words are clear and unambiguous, without resort to legislative intent or legislative history. Petitioners refer to this Court's holding that "When the authority to prescribe legislative regulations exists, this Court is not inclined to interfere if the regulations as written support the taxpayer's position." *Walt Disney, Inc. v. Commissioner*, 97 T.C. 221, 228 (1991), revd. on other grounds 4 F.3d 735 (9th Cir. 1993); see also *Transco Exploration Co. v. Commissioner*, 95 T.C. 373, 383–384 (1990), affd. 949 F.2d 837 (5th Cir. 1992); *Woods Inv. Co. v. Commissioner*, 85 T.C. 274, 281–282 (1985). Respondent cites the plain meaning of the words "gross income" in section 613(a) to assert that the correct interpretation of the regulation at issue is that "gross income from the property" can never exceed "gross income". Respondent contends that petitioners' interpretation of the last sentence of section 1.613–3(a), Income Tax Regs., is to amend the phrase "gross income from the property" to read "gross value of the property", which would be inconsistent with the legislative history of percentage depletion generally and of this sentence of the regulation specifically.

---

[8] We note that the Court of Federal Claims, in an order in another case involving the same issue in Exxon's 1974 tax year, addressed this issue and held that the literal language of the regulation controlled. Docket No. 660–89T (June 29, 1993). For the reasons discussed below, we do not agree with the conclusion of this order on this issue. See *Panhandle Eastern Pipe Line Co. v. United States*, 187 Ct. Cl. 129, 408 F.2d 690, 716, 717 (1969). Also, Rev. Rul. 90–62, 1990–2 C.B. 158, addressed the issue and concluded that, if gas is sold after it is transported from the wellhead for a price that is lower than the RMFP, gross income from the property is determined for purposes of percentage depletion without regard to the RMFP. However, as we have often stated, a revenue ruling is only a statement of respondent's position and is entitled to no precedential weight.

The regulation at issue is legislative in nature,[9] and the rules of interpretation applicable to statutes should be used in determining the meaning of legislative regulations. 1A Singer, Sutherland Statutory Construction, sec. 31.06, at 532 (4th ed. 1985); see *Trustees of Ind. Univ. v. United States*, 223 Ct. Cl. 88, 618 F.2d 736, 739 (1980); *Rucker v. Wabash R.R.*, 418 F.2d 146, 149 (7th Cir. 1969). The cases discuss two principles which, although often used to achieve opposite results, are essentially consistent with one another. The first is the well-established principle that, where the language at issue is ambiguous, it is necessary to examine the underlying statutory framework and legislative history to understand its correct meaning. *Emery Mining Corp. v. Secretary of Labor*, 744 F.2d 1411, 1414 (10th Cir. 1984) (construe ambiguous statute in light of statute it implements). On the other hand it also has been stated that

courts are forbidden to tamper with the plain meaning of the words employed unless they are clearly ambiguous or nonsensical. The concomitant rule of interpretation is that courts may not re-write inartfully but unambiguously drafted legislation in order to accomplish results perceived by the court to be the goals of such flawed legislation.

*Grider v. Cavazos*, 911 F.2d 1158, 1162 (5th Cir. 1990); accord *King Ranch, Inc. v. United States*, 946 F.2d 35, 37 (5th Cir. 1991); *International Trading Co. v. Commissioner*, 484 F.2d 707, 711 (7th Cir. 1973), revg. and remanding 57 T.C. 455 (1971). We are not prepared to reach the conclusion that the regulation at issue is so clear on its face that we cannot call it ambiguous. Indeed, there is considerable room for argument that the regulation is quite ambiguous.[10] But

---

[9] Sec. 611(a) provides: "such reasonable [depletion] allowance in all cases [is] to be made under regulations prescribed by Secretary." Where a regulation is promulgated pursuant to a specific statutory authority, it is a substantive rule, legislative in character. *Wing v. Commissioner*, 81 T.C. 17, 28 (1983) (depletion regulations are legislative in character and thus subject to the Administrative Procedure Act, 5 U.S.C. secs. 500–559 (1988)).

[10] We note that petitioners concede the ambiguity of the language at issue at one point in their brief. It is arguable that the pertinent language, that "the gross income from the property shall be *assumed* to be equivalent to the representative market or field price of the oil or gas before conversion or transportation", contains sufficient ambiguity that there is room for interpretation of the underlying purpose of the statute. (Emphasis added.) The word "assume" commonly means to "take as granted or true", Webster's Ninth New Collegiate Dictionary (1985), or to "pretend", Black's Law Dictionary 122 (6th ed. 1990). However, the implication in this word as well as in its close counterpart "presume" ("to assume beforehand", Black's Law Dictionary 1185 (6th ed. 1990)) is that there is room for potential dispute if the "assumption" does not hold with logic or substance; hence there is the "rebuttable presumption". Contrary to petitioners' assertion that the language of this regulation mandates a "conclusive presumption", we find

even if we were to conclude that the regulation is not "clearly ambiguous" on its face, the rule of statutory construction quoted above also requires us to determine whether the "plain meaning" would have a nonsensical result in the context of the facts in this case.

In making this determination, our review of the cases has revealed that there has been considerable erosion of the rule foreclosing inquiry of legislative purpose even in the context of "clear" language. A long line of precedent establishes the principle that a provision may be interpreted in a manner contrary to its unambiguous language "when the intent of the legislative scheme clearly indicates a result contrary to that dictated by" the literal language. *Abdalla v. Commissioner*, 647 F.2d 487, 496 (5th Cir. 1981), affg. 69 T.C. 697 (1978). "It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers." *United Steelworkers of America v. Weber*, 443 U.S. 193, 201 (1979) (quoting *Church of the Holy Trinity v. United States*, 143 U.S. 457, 459 (1892)). Accordingly, the plain meaning rule does not preclude an examination behind the literal terms of the language at issue if the lack of such an examination would "compel an odd result". *Public Citizen v. United States*, 491 U.S. 440, 454 (1989) (quoting *Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 509 (1989)). The Supreme Court summarized this as follows:

As we said in *Church of the Holy Trinity v. United States*, 143 U.S. 457, 459 (1892): "[F]requently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act."

Where the literal reading of a statutory term would "compel an odd result," *Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 509 (1989), we must search for other evidence of congressional intent to lend the term its proper scope. See also, e.g., *Church of the Holy Trinity, supra*, at 472; *FDIC v. Philadelphia Gear Corp.*, 476 U.S. 426, 432 (1986). "The cir-

---

no such conclusive presumption to exist and, even if we were not otherwise permitted to do so as we discuss in the text, we believe that there would be sufficient ambiguity in this language to permit examination of legislative intent under the "plain meaning rule". Cf. Fed. R. Evid. 301. We note also that understanding *"representative* market or field *price"* requires some interpretation as to the meaning of these terms in this situation. Sec. 1.613-3(a), Income Tax Regs. (emphasis added).

cumstances of the enactment of particular legislation," for example, "may persuade a court that Congress did not intend words of common meaning to have their literal effect." *Watt v. Alaska*, 451 U.S. 259, 266 (1981). Even though, as Judge Learned Hand said, "the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing," nevertheless "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary, but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." *Cabell v. Markham*, 148 F.2d 737, 739 (CA2), aff'd, 326 U.S. 404 (1945). Looking beyond the naked text for guidance is perfectly proper when the result it apparently decrees is difficult to fathom or where it seems inconsistent with Congress' intention, since the plain-meaning rule is "rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists." * * * *Boston Sand & Gravel Co. v. United States*, 278 U.S. 41, 48 (1928) (Holmes, J.).

*Public Citizen v. United States, supra* at 453–455; see also *Commissioner v. Brown*, 380 U.S. 563, 571 (1965); *United States v. American Trucking Associations*, 310 U.S. 534, 543–544 (1940). Although there has at times been disagreement as to their applicability to particular statutes and legislative scenarios, these principles have been applied in cases before this Court. E.g., *Estate of Sachs v. Commissioner*, 88 T.C. 769, 773 (1987), affd. in part and revd. in part on other grounds 856 F.2d 1158 (8th Cir. 1988); *Knowlton v. Commissioner*, 84 T.C. 160, 162–165 (1985), affd. 791 F.2d 1506 (11th Cir. 1986); *Carson v. Commissioner*, 71 T.C. 252, 262 (1978), affd. 641 F.2d 864 (10th Cir. 1981); *Carasso v. Commissioner*, 34 T.C. 1139, 1142 (1960), affd. 292 F.2d 367 (2d Cir. 1961); see also *DePaolis v. Commissioner*, 69 T.C. 283, 285–288 (1977). Where, however, a provision is clear on its face, we should require unequivocal evidence of legislative purpose before construing a statute so as to override its plain meaning. *Huntsberry v. Commissioner*, 83 T.C. 742, 747–748 (1984); *Busse v. Commissioner*, 58 T.C. 389, 392 (1972), affd. 479 F.2d 1147 (7th Cir. 1973). Accordingly, we briefly examine the legislative purpose and history of percentage depletion to ascertain whether and to what extent the statutory framework comports with a literal interpretation of the regulation at issue.

Originally depletion was intended to constitute a tax-free return of the taxpayer's investment or a recoupment to the taxpayer for exhaustion of the resource. *Commissioner v.*

*Portland Cement Co.*, 450 U.S. 156, 167 (1981); *United States v. Cannelton Sewer Pipe Co.*, 364 U.S. 76, 81 (1960); *Commissioner v. Southwest Exploration Co.*, 350 U.S. 308, 312 (1956); *Brea Canon Oil Co. v. Commissioner*, 29 B.T.A. 1134, 1137 (1934), affd. 77 F.2d 67 (9th Cir. 1935). In the Revenue Act of 1913, the first cost method of computing depletion deductions was established. Revenue Act of 1913, ch. 16, sec. II(B), (G)(b), 38 Stat. 167, 172. Under this approach, a producer could deduct the total cost of the property or its March 1, 1913, fair market value, whichever was higher, over the life of the property, not to exceed 5 percent of the gross value of production during the year.[11] See Staff of Joint Comm. on Taxation, Legislative History of Depletion Allowances 1 (1950) (Staff Summary); Burke, "Incentives to Develop Natural Resources: Factors Affecting Industries Involved in Natural Resource Exploitation; Oil and Gas; Hard Minerals; Timber", 33d Ann. N.Y.U. Tax Inst. 1541, 1542–1543 (1975) (Burke). In order to encourage investment and development of badly needed oil supplies, the 1918 Revenue Act contained a new method called "discovery depletion", whereby the value of the depletable property was permitted to be based upon the cost or fair market value of the property at the date of discovery of oil or within 30 days thereafter. Revenue Act of 1918, ch. 18, secs. 214(a)(10), 234(a)(9), 40 Stat. 1067–1068, 1078. Subsequently, there was concern, however, that corporations frequently were taking advantage of this valuation method and using it to obtain depletion deductions in excess of income, thereby offsetting income from corporate activities unrelated to the depleted property. See Hearings on H.R. 8245 Before the Senate Comm. on Finance, 67th Cong., 1st Sess. 266 (1921); S. Rept. 275, 67th Cong., 1st Sess. 15 (1921), 1939–1 C.B. (Part 2) 181, 191. Thus in 1921 a limitation was added to discovery depletion that it could not exceed the net income from the property. Revenue Act of 1921, ch. 136, sec. 234(a)(9), 42 Stat. 256. Regulations implementing the net income limitation of this provision defined "net income" as "the gross income from the sale of all mineral products * * * less operating expenses"; they also provided that, in the event that products were manufactured or

---

[11] In the Revenue Act of 1916, the 5-percent limitation was abandoned and the depletion amount was not to exceed the invested capital (cost) or the Mar. 1, 1913, value. Revenue Act of 1916, ch. 463, secs. 5(a)(8), 12(a)(2), 39 Stat. 759, 768.

refined prior to sale, "the gross income shall be assumed to be equivalent to the market or field price of the raw material before conversion", a concept employed in the regulation at issue. Regs. 62, art. 201(h) (1922). As a result of congressional concern about continued instances in which corporations overvalued depletable properties,[12] this limitation was reduced further to 50 percent of net income by the Revenue Act of 1924, ch. 234, sec. 204(c), 43 Stat. 260.[13]

Valuations of properties, however, caused frequent disputes between taxpayers and taxing authorities, and these administrative and valuation difficulties resulted in the development of a completely new type of depletion. Burke, *supra* at 1544–1545. Not surprisingly, experience had shown that the value of oil in the ground for discovery depletion purposes was consistently related to the market price of the oil. Austin, "Percentage Depletion: Its Background and Legislative History", 21 Kan. City U. L. Rev. 22, 26–27 (1952). An approximately equivalent overall result to discovery depletion was able to be achieved through a new concept whereby depletion was allowed as a percentage of income. Accordingly, in the Revenue Act of 1926, "In the interest of simplicity and certainty in administration", H. Rept. 356, 69th Cong., 1st Sess. 31 (1926), 1939–1 C.B. (Part 2) 362, discovery depletion was eliminated and a system of percentage depletion was enacted, whereby 27.5 percent of the gross income from the property became the measure for the depletion allowance. Ch. 27, sec. 204(c)(2), 44 Stat. 16. The 50 percent of net income limitation was retained in the new provision.

In discussing the general effect of the 1926 Act, the Joint Committee report described the relevant terms as follows:

---

[12] The Joint Committee Staff reported that Ways and Means Committee Chairman Green had expressed the following concern:

At present [a depletion deduction] may be as great as the entire net income on the property depleted, and I have known instances where companies actually advertised that they could make a distribution of their dividends without paying any corporation tax * * *. I think in many instances they have succeeded in evading the corporation tax through depletion allowances.

Staff of Joint Comm. on Taxation, Legislative History of the Depletion Allowances 5 (1950).

[13] A Treasury ruling in 1926 also was directed toward these concerns about depletion deductions being used to offset other income. It ruled that, under discovery depletion, an amount in excess of the fair market value of the product from the property at the date of discovery could not be applied against income from other sources. I.T. 2269, V–1 C.B. 256 (1926). This ruling was interpreting depletion under the Revenue Act of 1918 which, as discussed in the text, was based upon the fair market value at the date of discovery.

"From the property" is interpreted to mean from each individual tract or lease. In other words, the net or gross income must be computed not for all the properties of the taxpayer lumped together, but from each individual leasehold.

"Gross income from the property" may be defined, therefore, for oil and gas properties, as the *gross receipts* from the sale of oil and gas as it is delivered from the property less the royalties paid in cash, if any. As it is not customary for operators to report oil royalties as a part of their receipts ordinarily, gross income will coincide with gross receipts. * * * . In the case of taxpayers who are operators, refiners, transporters, etc., the gross income from the property must be computed from the production and posted price of oil, as the gross receipts from a refined and transported product can not be used in determining the income as relating to an individual tract or lease.

[Staff of Joint Comm. on Internal Revenue Taxation, Preliminary Report on Effect of Section 204(c)(2), Revenue Act of 1926, Depletion of Oil and Gas Wells 12–13 (1927); emphasis added.[14]]

As it indicates, the last sentence in the above quote was designed to provide guidance as to how to separate from the refining and transportation aspects of the resulting product that portion of the gross receipts which was attributable to the product as it came out of the ground before transportation or refinement. A few years later in 1929, the Commissioner incorporated the method employed by this concept into a regulation dealing with the definition of "gross income from the property", the predecessor to the regulation at issue (see Regs. 74, art. 221(i) (1931)), and, with a few minor amendments in 1933 and 1936, the amended regulations under the 1939 Code provided:

In the case of oil and gas wells, "gross income from the property" as used in section 114(b)(3) means the amount for which the taxpayer sells the oil and gas in the immediate vicinity of the well. If the oil and gas are not sold on the property but are manufactured or converted into a refined product prior to sale, or are transported from the property prior to sale, the gross income from the property shall be assumed to be equivalent to the representative market or field price (as of the date of sale) of the oil and gas before conversion or transportation. [Sec. 39.23(m)–1(e)(1), Regs. 118 (1953).]

According to the testimony of Mr. B.H. Bartholow, then a Special Assistant to the Secretary of the Treasury, at hearings before the Joint Committee in 1930, the purpose for the

---

[14] While Joint Committee on Taxation staff explanations are not technically legislative history, we find this one to be useful in understanding the background meaning of the terms at issue, as did the Supreme Court in *United States v. Cannelton Sewer Pipe Co.*, 364 U.S. 76, 81 (1960).

use of the market or field price of oil at the well was to eliminate postextraction income from the depletion computation. See Hearings Before the Joint Committee on Internal Revenue Taxation, 71st Cong., 3d Sess. 104, 111 (1930). The RMFP approach also was found to be designed to prevent discrimination in favor of integrated producers by eliminating profits attributable to postproduction processes. See *Hugoton Prod. Co. v. United States*, 172 Ct. Cl. 444, 349 F.2d 418, 425–427 (1965) (citing *United States v. Cannelton Sewer Pipe Co.*, 364 U.S. 76 (1960)). This provision remained substantially the same under the 1954 Code, except that the phrase "(as of the date of sale)" has been deleted. See sec. 1.613–3(a), Income Tax Regs.

In 1932, percentage depletion was extended to metal, coal, and sulphur mines. Revenue Act of 1932, ch. 209, sec. 114(b)(4), 47 Stat. 203. Over the next several years, percentage depletion was applied to various other metals and nonmetals. Staff Summary at 20–31. In 1969, the percentage depletion rates were changed, including reduction in the rate on oil and gas production from 27.5 percent to 22 percent. Tax Reform Act of 1969, Pub. L. 91–172, sec. 501(a), 83 Stat. 629. But the basic substance of percentage depletion as it applied to oil and gas did not change until 1974, when percentage depletion was repealed for tax years after 1974, with certain exceptions. Tax Reduction Act of 1975, Pub. L. 94–12, sec. 501, 89 Stat. 47. Most taxpayers who took a depletion deduction after February 1, 1975, were not permitted to use percentage depletion under section 613. Sec. 613A(a). It is under the fixed contract exception contained in section 613A(b)(1)(B)[15] that petitioners claim that they continue to enjoy the benefit of a 22-percent depletion rate. The conference report on the Tax Reduction Act of 1975 indicates that percentage depletion was continued for natural gas sold under fixed price contracts because those contracts did "not permit price adjustment after * * * [February 1, 1975] to

---

[15] Sec. 613A(b) provides:

(1) IN GENERAL.—The allowance for depletion under section 611 shall be computed in accordance with section 613 with respect to—

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(B) natural gas sold under a fixed contract,

and 22 percent shall be deemed to be specified in subsection (b) of section 613 for purposes of subsection (a) of that section.

reflect repeal of depletion." H. Conf. Rept. 94–120 (1975), 1975–1 C.B. 624, 629.

In a nutshell, the legislative and administrative history of percentage depletion consistently shows two related concerns on the part of the legislators and administrators: First, there was concern about the possible abuse of the depletion deduction and its use to reduce profits from other lines of business unrelated to the purposes for depletion, those purposes being the return of capital to encourage further investment in oil and gas and recoupment for exhaustion of the resource. Second, there was concern that integrated producers might be able to obtain a competitive advantage over nonintegrated producers by taking a depletion deduction on that portion of a finished product—transportation, refining, or conversion—which already was otherwise qualified for depreciation. This concern about the competitive position of nonintegrated producers is amply described in the case law, e.g., *Commissioner v. Engle*, 464 U.S. 206, 208–218 (1984);[16] *United States v. Cannelton Sewer Pipe Co.*, 364 U.S. 76, 86–87 (1960); *Hugoton Prod. Co. v. United States, supra* at 425–427, and is evidenced in section 613A(c), which exempts independent producers and royalty owners from the repeal of percentage depletion. The fixed contract exception to the repeal of percentage depletion in section 613A(b)(1)(B) and (3)(A) assumed that sellers of natural gas under fixed contracts could not obtain the benefits of higher prices and thus were also entitled to continued use of percentage depletion at the 22 percent rate.

Petitioners assert that one of the primary reasons for the creation of percentage depletion was to simplify the system by eliminating the need for a difficult and complicated valuation process, and that this mandates the use of the RMFP's in all cases. The literal terms of the regulation, however, must be viewed in context: The RMFP technique referred to by the Joint Committee Staff and later embraced by the Commissioner in the regulation at issue was designed to prescribe a simplified method by which to ascertain that portion of the taxpayer's receipts which was attributable to the gas

---

[16] In 1986, Congress prohibited depletion deductions on advance royalties and bonuses, contrary to the holding in *Commissioner v. Engle*, 464 U.S. 206 (1984). Tax Reform Act of 1986, Pub. L. 99–514, sec. 412(a)(1), 100 Stat. 2085, 2227; see sec. 613A(d)(5). The Court's discussion of general historical depletion policy remains sound, however.

at the wellhead without improvement or transportation; it thus was designed to separate those portions of gross receipts which were appropriate for depletion from those which were not. We see no indication that it was designed to create income that never existed in order to inflate a depletion deduction. Compare *Bloomington Limestone Corp. v. United States*, 445 F.2d 1105, 1110 (7th Cir. 1971) with *Gray Knox Marble Co. v. United States*, 257 F. Supp. 632, 643 (E.D. Tenn. 1966). To allow such an inflation also would be completely contrary to the assumption behind the fixed contract exception to the repeal of percentage depletion, for it would give petitioners a "have your cake and eat it too" benefit that would frustrate the purpose of section 613A.

Our review of the case law confirms this conclusion. While few of the cases deal directly with the last sentence of the regulation at issue, a number of cases provide a great deal of insight into what the concept "gross income from the property" means in a more general context.[17] In *Helvering v. Twin Bell Oil Syndicate*, 293 U.S. 312 (1934), an early case under percentage depletion, the Supreme Court had to allocate percentage depletion between a lessor and lessee of oil and gas income. The taxpayer wanted to use for gross income from the property the gross production of the wells, including royalties paid, whereas the Commissioner treated gross production less royalties as the measure of the taxpayer's depletable interest.[18] *Id.* at 320. The Court held for the Commissioner, in part because the royalties were "gross income" to those receiving them, and to embrace the taxpayer's position would have permitted a total depletion allowance in excess of 100 percent of the taxpayer's total receipts, which "would not be a single allowance, apportioned between

---

[17] Petitioners state that many of the cases discussed below, which do not deal with sales away from the wellhead under the last sentence of sec. 1.613–3(a), Income Tax Regs., but rather with the earlier portion of that regulation and situations where the gas was sold in the vicinity of the well, are irrelevant to the last sentence; this assumes that the last sentence of the regulation is for some special reason not related to the general "gross income from the property" concept. As discussed, our review of the legislative history reveals that the last sentence of the regulation was created in order to separate by a relatively simple method that portion of total proceeds of a transported item which was attributable to the gas at the well, which is consistent with the scope and purpose of the rest of the regulation and percentage depletion generally. Therefore, petitioners' argument about the lack of relevance of these cases is unpersuasive.

[18] After the year at issue, Congress amended the percentage depletion statute to authorize the procedure recommended by the Commissioner and used by the Court in *Helvering v. Twin Bell Oil Syndicate*, 293 U.S. 312, 322 (1934). Revenue Act of 1932, ch. 209, sec. 114(b)(3), 47 Stat. 202; see sec. 613(a).

lessor and lessee." *Id.* The Court also noted the requirement that one who takes a depletion deduction is required to have an economic interest in the property upon which depletion is based. By apportioning the royalty portion to the recipient of the royalties, and the total receipts less the royalties to the taxpayer, the Court indicated that it was giving "regard to the economic interest of each of the parties entitled to participate in the depletion allowance." *Id.* at 321. While we note that respondent has stipulated for purposes of this motion that "Exxon possessed the requisite economic interest in the wells for which percentage depletion is claimed", this does not mean that respondent concedes that Exxon possesses an economic interest in the portion of the depletion taken in this case in excess of the actual proceeds received. We agree with the Supreme Court in *Twin Bell* that it is hard to see how one could have an economic interest in such a fictional amount. The predecessor to this Court cited *Twin Bell* with approval long ago when it stated that "gross income from the property" meant "gross income from the property received by the particular taxpayer claiming a deduction for depletion and is synonymous with the amount to be included in the taxpayer's gross income under section 22." *McLean v. Commissioner*, 41 B.T.A. 565, 575 (1940), affd. 120 F.2d 942 (5th Cir. 1941).

In *Crews v. Commissioner*, 89 F.2d 412 (10th Cir. 1937), certain funds in escrow had been misappropriated before the taxpayers were entitled to them under the terms of a settlement agreement. *Id.* at 414. The Court of Appeals for the Tenth Circuit held that there was no gross income from the property as to the misappropriated amount because the taxpayers had never received this amount either actually or constructively, and that gross income "to the taxpayer" is necessarily implied; clearly the court there treated "gross income from the property" as being within the scope of gross income concepts generally. *Id.* at 415. The court stated:

> To allow a deduction on the basis of income never received and therefore no part of the gross income, on the net part of which a tax is exacted would be manifestly unfair. While oil extracted and sold to the Refining Company depleted the land, the depletion allowance is not granted to create a depletion reserve but to allow a deduction from gross income for tax purposes and there should not be included in such gross income proceeds

of oil never received by the taxpayer and no part of which became subject to income taxation. [*Id.* at 416.]

Similarly, the "phantom" income at issue here was never received by petitioners, nor was it treated as income on their consolidated return. We find it at least as unfair to allow it to be treated as gross income from the property as the court did in *Crews*. See also *Commissioner v. Portland Cement Co. of Utah*, 450 U.S. 156, 172 (1981) ("gross income from mining means income received, whether actually or constructively, without regard to value"); *Helvering v. Mountain Producers Corp.*, 303 U.S. 376, 382 (1938) (" 'gross income from the property' * * * should be taken in its natural sense. With the motives which lead the taxpayer to be satisfied with the proceeds he receives we are not concerned.").

Although it dealt with the somewhat different legislative history of depletion of minerals, the Supreme Court in another case, *United States v. Cannelton Sewer Pipe Co.*, 364 U.S. 76 (1960), made an important point that is highly relevant to the instant case. After reviewing the history of depletion generally and minerals specifically, the Court emphasized that depletion is an allowance for the exhaustion of capital assets, not a subsidy for manufacturers. *Id.* at 86. The Court indicated that "Congress intended to grant miners a depletion allowance based on the constructive income from the raw mineral product, if marketable in that form, and not on the value of the finished articles." *Id.* Thus the location of the line between production and manufacturing was important in that case. In applying this principle to this case, we are compelled to conclude that use of the RMFP's in this situation would fly in the face of the principles enunciated in *Cannelton*. Use of the RMFP's here would allow petitioners, integrated producers, to reap benefits not intended for them, not only by allowing depletion on transported gas, but at five times the actual proceeds therefrom, thereby allowing completely unrelated profits to be offset. This is far beyond the "subsidy for manufacturers" that *Cannelton* prohibited.

In 1961, this Court decided the case of *Shamrock Oil & Gas Corp. v. Commissioner*, 35 T.C. 979 (1961), affd. 346 F.2d 377 (5th Cir. 1965). There we indicated that the last sentence of the regulation providing for use of RMFP "shall be applied" to sales of gas away from the wellhead, and did not

discuss the circumstances under which it was or was not appropriate to apply an alternate method. *Id.* at 1030. We then went on to discuss the method of determining the RMFP. In connection with this issue, we noted that for integrated producers under the regulation "the amount of depletion may not vary with their individual situations",[19] but that "This is no reason for departing from the general principle that the statute bases the percentage on what the producer actually receives for the oil or gas at the well rather than its market value." *Id.* at 1038. We noted earlier cases such as *Greensboro Gas Co. v. Commissioner*, 30 B.T.A. 1362 (1934), affd. 79 F.2d 701 (3d Cir. 1935), where the issue had been at what point to measure the gross income from the property, and the Board had concluded that the price at which the taxpayer sold its gas to the ultimate consumers clearly would not be the figure to use, since transportation and distribution costs did not constitute gross income from the property for depletion purposes. *Id.* at 1368–1369. We concluded in *Shamrock* that we should rely upon the weighted average prices of gas actually sold during the year at issue, regardless of when the sales contracts were negotiated. *Shamrock Oil & Gas Corp. v. Commissioner, supra* at 1039–1040.

A series of cases in the U.S. Court of Claims provides us with further guidance as to how the last sentence of the regulation at issue is being interpreted in the courts. In *Hugoton Prod. Co. v. United States*, 161 Ct. Cl. 274, 315 F.2d 868 (1963) (Hugoton I), the Court of Claims was urged by the Government to use the "proportionate profits" method to calculate gross income from the property, which is similar to the "net-back" methodology employed by respondent in this case, and the taxpayer wanted to use the "market comparison" (or RMFP) method. The court required the use of the RMFP in that case, stating: "The regulations provide that gross income from the property shall be assumed the equivalent of the representative market or field price at the wellhead so that, if there is such a price, it must govern here." *Id.* at 871.

---

[19] Petitioners quote *Shamrock Oil & Gas Corp. v. Commissioner*, 35 T.C. 979, 1038 (1961), affd. 346 F.2d 377 (5th Cir. 1965), for the proposition that depletion in cases where the gas is transported from the premises "may not vary with * * * [producers'] individual situations." This quote was used by petitioners out of context. It was made in the context of a discussion of the method by which to compute the RMFP, not whether the RMFP had to be used in all situations. Accordingly, we do not find this sentence to be appropriately used as the basis for an issue that was not discussed by the Court.

Despite this broad language, the Court of Claims, in discussing the rationale of the last sentence of the regulation at issue calling for use of the RMFP, notably stated:

From the outset, the producer has been held entitled to include in gross income for purposes of the percentage depletion allowance only so much of the *proceeds* from the sale of the gas as he would have received had he sold the gas at the wellhead. [*Id.* at 869; emphasis added; fn. ref. omitted.]

The court went on to note that there were considerable complexities involved in the use of the RMFP, and that perhaps the proportionate profits method might have been more appropriate or feasible than the RMFP method, since the former method "has the advantages of being related directly to the taxpayer's own income." *Id.* at 872. Nevertheless, the court concluded, the Government had chosen the RMFP method in the regulation at issue, and the problem of determining an RMFP was not "of such unusual or inordinate difficulty as to preclude use of the method prescribed as the norm" by the regulation. *Id.* at 873. The court then went on to decide, following our holding in *Shamrock*, that the RMFP should be based upon contracts under which gas was sold during that year rather than contracts entered into in that year.[20] As we discuss *infra*, Hugoton I does not by its own language require the use of an RMFP in all situations where gas is sold away from the wellhead, and, to the extent that petitioners conclude that it is intended to be read in that manner, we do not agree with such a conclusion. As the Court of Claims observed in Hugoton I in its comments about the method of determining RMFP, "the *representative price* is the price which is in fact being *obtained* under all existing

---

[20] The Court of Claims noted that the typical nonintegrated producer had to enter into long-term contracts and obtained the benefit of rising prices only to the extent that there were escalator clauses in the contract; thus a method employing contracts entered into over several years would tend to equalize the depletion allowance as between integrated and nonintegrated producers, as required by the Supreme Court in *United States v. Cannelton Sewer Pipe Co.*, 364 U.S. 76, 86 (1960). *Hugoton Prod. Co. v. United States*, 161 Ct. Cl. 274, 315 F.2d 868, 876 (1963). In noting that the integrated taxpayer in Hugoton might have otherwise been able to benefit from price increases not available to nonintegrated producers, use of the market comparison method rather than proportionate profits method made the increases in market price irrelevant because:

We look to see what price plaintiff would have obtained for its gas at the wellhead if unintegrated, and we must disregard any increases in *gross income* which he obtains by virtue of the fact that he is integrated. * * * [*Id.;* emphasis added.]

Thus the Court of Claims in choosing the weighted average method of determining the RMFP was not willing to use the *current value* of the gas, but required the use of the *gross proceeds* received by the taxpayers under prices determined over a period of years.

comparable contracts." *Id.* at 874 (emphasis added). A "gross income from the property" figure that is five times petitioners' actual gross income for the gas after transportation can hardly be considered "representative". The case in Hugoton I was remanded for further findings on the appropriate RMFP. *Id.* at 877.

During that remand, in *United States v. Henderson Clay Prods.*, 324 F.2d 7, 8 (5th Cir. 1963), the Court of Appeals for the Fifth Circuit had to determine the taxpayer's "gross income from mining", which is similar to the "gross income from the property" calculation for oil and gas. The mining regulation at issue in that case differed from the regulation at issue here, in that the mining regulation stated that, when the mined product is processed or transported away from the mining site, the taxpayer used either the RMFP or, if there was no RMFP, a figure computed by the proportionate profits method. *Id.* at 9; see sec. 39.23(m)–1(e)(3), Regs. 118 (1953). The taxpayer, an integrated manufacturer that mined ball clay, transported and formed it into bricks, fired the bricks in kilns, and shipped, stored, or sold the bricks, used gross income from finished brick as the basis for its depletion allowance on its tax return. *United States v. Henderson Clay Prods., supra* at 9. After *United States v. Cannelton Sewer Pipe Co., supra,* held that the percentage depletion allowance had to be cut off at the point where the mineral first became suitable for industrial use or consumption, the taxpayer had argued, and the District Court had found, that there was an RMFP and a national market for shredded ball clay, and that such a market was to be used. *Henderson Clay Prods. v. United States*, 199 F. Supp. 304, 311 (E.D. Tex. 1961). In reversing and holding that the taxpayer had to use the proportionate profits method, the Court of Appeals for the Fifth Circuit found the following comparative figures to be significant:

|  | Actual gross income from sale of brick | Hypothetical gross income from the property—ball clay |
|---|---|---|
| 1951 | $468,694.11 | $562,172.10 |
| 1952 | 465,668.33 | 543,436.95 |
| 1953 | 482,294.78 | 563,842.65 |
| 1954 | 520,684.56 | 581,570.85 |

324 F.2d at 12.[21] After noting these figures, the court responded to the argument of the taxpayer that there was nothing incongruous about allowing a "gross income from mining" that exceeded the amount actually received by the taxpayer as follows:

Tax law is law unto itself. There are no equities in tax law. And there is an area of permissible illogic in tax law. But when a taxpayer claims depletion on a fictitious gross income greatly in excess of its actual gross income, we find the claim highly indigestible. [Id.]

Thus, the fact that the finished product (brick) actually sold for considerably less than the hypothetical "gross income from the property" based on the raw material (ball clay) was simply an unacceptable result, one clearly contravening the mandate in *Cannelton* that integrated manufacturers should not be given a preference over nonintegrated mining companies. The court found that the price of ball clay was not representative because its use did not fulfill the statutory objective of estimating that part of the integrated producer's gross income which was attributable to the operation of mining. *Id.* at 15. Accordingly, the proportionate profits method had to be used since that method came closer to effecting the legislative intent of depletion. *Id.* at 16.

Subsequent to the remand in Hugoton I, the parties' positions were reversed from their earlier positions[22] in *Hugoton Prod. Co. v. United States*, 172 Ct. Cl. 444, 349 F.2d 418 (1965) (Hugoton II). In Hugoton II, the Court of Claims reaffirmed its required use of the RMFP in that case and distinguished the intervening decision of the Court of Appeals for the Fifth Circuit in *United States v. Henderson Clay Prods., supra*. The court in Hugoton II noted that rejection of the RMFP had "necessarily followed" in the *Henderson* context partly because, by using the RMFP or market comparison method, the depletion allowance would not have been limited to the taxpayer's income from the marketable product closest to the raw mineral, since the figure computed

---

[21] The court noted that the disparity between the price for the brick and the representative (market) price for ball clay, strange as it seemed, was explainable on the ground that there was a relatively small market for clay as contrasted with brick. *United States v. Henderson Clay Prods.*, 324 F.2d 7, 10 (5th Cir. 1963).

[22] The taxpayer contended that the RMFP could not be determined on the basis of interstate sales because it was engaged only in intrastate business, where prices were higher. *Hugoton Prod. Co. v. United States*, 172 Ct. Cl. 444, 349 F.2d 418, 421 (1965) (Hugoton II). The taxpayer now argued for the use of the proportionate profits method. *Id.* at 422.

by use of the market comparison method "would give it credit for expenses it never incurred." *Id.* at 426. This is similar to the result that would follow here if the RMFP's were used.[23] Because it found *Henderson's* facts to be distinguishable, the Court of Claims did not follow the *Henderson* result.[24]

The court in Hugoton II held that "The 'representative market or field price' required by the Regulation demands the utilization of an accounting system which considers comparative sales." *Id.* at 427. Subsequently, the Court of Claims dealt with the question of comparative sales in *Panhandle Eastern Pipe Line Co. v. United States*, 187 Ct. Cl. 129, 408 F.2d 690 (1969). In *Panhandle*, the court concluded that a comparative sale had been proven to determine the market price at the wellhead from the Howell Field. *Id.* at 715–716. Nevertheless, the court rejected the use of the RMFP computed by this comparative sale and required use of a proportionate profits method. The Court of Claims found that, despite the strong language used in Hugoton II that a literal reading of the regulation at issue "'forecloses any consideration of a proportionate profits formula'", *id.* at 717 (quoting *Hugoton Prod. Co. v. United States*, 349 F.2d at 427), the RMFP method prescribed in the regulation had been characterized by the court in Hugoton I as a "norm", and in *Panhandle* the determination of an RMFP presented sufficient difficulty that it was not precluded from using another method from that norm, *id.*

[23] In Hugoton II the court also noted that in *Henderson* the market comparison method did not reflect the taxpayer's constructive income because there was no competition between the taxpayer and miners of similar clay, which was not the case in Hugoton II, where the taxpayer not only was in competition with other producers but, because it was integrated, was able to command a higher price than its competitors. The record on these motions does not contain any evidence concerning the markets in which petitioners competed, and we therefore are unable to engage in a discussion of this matter. However, the Hugoton II court found that use of the proportionate profits method there would violate the spirit of *United States v. Cannelton Sewer Pipe Co., supra,* in that it would permit the taxpayer to obtain a higher price and therefore result in an advantage to the taxpayer because it was integrated. *Id.* at 426. This is the reverse of the situation here, where use of the RMFP's would provide an advantage to the integrated petitioners not available to their unintegrated competitors, who would be required to use the lower contract (actual) price under the fixed contract.

[24] In a subsequent case in this Court involving the successor to the Hugoton Production Co., we acknowledged the statements by the Court of Claims in the two prior Hugoton cases that under the last sentence of the regulation the wellhead price to be used is the RMFP. *Mesa Petroleum Co. v. Commissioner*, 58 T.C. 374, 380 (1972). We noted, however, that the alternative method proposed (the so-called "Matzen" formula) could not be used because the result "would improperly allow * * * [the taxpayer] a depletion allowance on its gathering, manufacturing, and marketing profits." *Id.* at 381.

The difficulty in determining the RMFP articulated by the court was that, while a market price of 32½ cents per MCF[25] had been proven for the sales of gas at issue, this also was the same as the price that the taxpayer received for the gas after it was gathered, transported, and delivered away from the wellhead. *Id.* at 716. The court concluded that

using the market comparison method and making such a determination on the basis of the unusual facts existing with respect to the issue at hand would stretch to the breaking point the doctrine of the *Hugoton* and *Shamrock* cases, *supra*, and conflict with the basic objectives underlying the decisions therein; defeat the purposes which led to judicial approval of the market comparison method including the use of weighted-average prices; and produce a price that could not be reasonably and realistically considered *representative* of plaintiff's economic situation or a "representative market or field price" in any real sense of such term.

The above-mentioned consequences of establishing 32½ cents per MCF of gas for all of plaintiff's Howell Field production add up to an end result essentially parallel in effect to the one that, among other factors, led the court, on appeal, in United States v. Henderson Clay Prod., 324 F.2d 7 (5th Cir. 1963), to reject the use of the market comparison method because it found such method to be "highly indigestible" [324 F.2d at 12]. We, too, find that a determination by us here that a 32½ cent price was the representative market or field price for plaintiff's production of gas sold at said price after it was transported and delivered away from the lease property would produce an indigestible result which we decline to swallow.

[*Id.;* fn. ref. omitted.]

Certainly an even more compelling case is presented here, where the affidavits and exhibits attached to the instant motions indicate that petitioners' proceeds for the gas at issue after it was transported away from the wells were far exceeded by the RMFP's used by petitioners on their return, a fact which petitioners do not appear to dispute.[26] Moreover, the purpose for the RMFP method was to provide a means by which parties could ascertain what portion of the taxpayer's *proceeds* from the sale of transported gas were attributable to the wellhead cost. *Hugoton Prod. Co. v. United States*, 161 Ct. Cl. 274, 315 F.2d 868, 869 (1963). It clearly was not designed to create "income from the property" that far exceeded the taxpayer's proceeds, for this would allow a

---

[25] An MCF is 1,000 cubic feet and is a standard of measure for natural gas.

[26] We note that petitioners, in opposing respondent's motion, do not dispute the fact that the RMFP's used on their return exceeded their proceeds, but contend that as a matter of law the regulation mandates the use of RMFP in all situations where gas is sold away from the wellhead, regardless of the actual proceeds received.

depletion allowance on income that may already have been attributable to a depreciation deduction, a result not indicated by the legislative history. We note that the statute at issue provides for a "reasonable allowance for depletion" under the "peculiar conditions in each case". Sec. 611(a). Under the facts here, the use of the RMFP's would not be reasonable. The net-back method of determining gross income from the property proposed by respondent, which is similar to the method required by the Court of Claims in *Panhandle Eastern Pipe Line Co. v. United States, supra,* is far more appropriately used here.[27]

We conclude that use of the RMFP's here, resulting in an income from the property for 1979 far in excess of petitioners' actual gross income after the gas was transported away from the wellhead, would be unreasonable in light of the legislative history of and purposes for depletion and the case law interpreting the relevant statute and regulation.[28] Accordingly, petitioners may not use RMFP's in computing their 1979 percentage depletion for the gas in question, and petitioners' cross-motion for summary judgment will be denied. On the other hand, it is reasonable to permit the use of the type of net-back method used by respondent herein to determine petitioners' gross income from the property for the

---

[27] Petitioners also attempt to distinguish *United States v. Henderson Clay Prods.*, 324 F.2d 7 (5th Cir. 1963), on the ground that it arose under the mining regulations, which specifically provided for the use of the proportionate profits method where an RMFP could not be determined, whereas the regulation at issue does not. Sec. 1.613–4(d), Income Tax Regs. The mining regulation subsequently also contained a presumption that, where the RMFP plus nonmining processes exceed the actual sales price, that price is not a representative price. Sec. 1.613–4(c)(6), Income Tax Regs. Petitioners further state that respondent had proposed to extend the hard minerals regulation to oil and gas but later withdrew that proposal, purportedly indicating an intent that it was not applicable. However, we agree with the reasoning of the Court of Appeals for the Fifth Circuit in *Henderson,* where it applied the same principles to a clay mining situation as it had to an oil and gas situation and stated that "The problem of depletion for the integrated driller-processor or driller-transporter raises the same definitional problems in the determination of gross income." *United States v. Henderson Clay Prods., supra* at 14. We note, moreover, that in *Panhandle Eastern Pipe Line Co. v. United States,* 187 Ct. Cl. 129, 408 F.2d 690 (1969), the Court of Claims applied the same holding in an oil and gas situation as we do here, without the existence of an oil and gas regulation. In the absence of any indication as to why respondent chose to withdraw the proposed regulations, we refuse to speculate, and we reach a logical result, as the Court of Claims did in *Panhandle.*

[28] In reaching this conclusion, we do not hold that the regulation is invalid; we hold only that the method provided by the last sentence is not applicable to the facts of this case. There may be particular situations in which it is reasonable based upon the "peculiar facts" to allow use of the RMFP even where it exceeds the taxpayer's actual gross income. We are not prepared even to attempt to define such situations or to delineate for other cases where the use of the RMFP may or may not be unreasonable. We hold only that its use would be unreasonable here where the result of using RMFP's is five times the actual sales proceeds from the sale of gas after it was transported away from the wellhead.

1979 tax year. Since the net-back method starts with petitioners' actual sales proceeds and reduces them by, inter alia, royalties and transportation expenses, petitioners will not be permitted to compute percentage depletion on the basis of gross income from the property that is greater than the actual sales proceeds of the gas in question. Respondent's motion will be granted.

*An order granting respondent's motion for partial summary judgment and denying petitioners' cross-motion for partial summary judgment will be issued.*